O. C. ALLEN, Petitioner,

v.

L. S. NELSON, Warden, Respondent.
No. C–72–928.

United States District Court,
N. D. California.
Feb. 15, 1973.

William Mandel, Petty, Andrews, Olsen, Tufts, Jackson & Sander, San Francisco, Cal., for petitioner.

Evelle J. Younger, Atty. Gen., Ira J. Ross, Deputy Atty. Gen., San Francisco, Cal., for respondent.

## MEMORANDUM OPINION AND ORDER

OLIVER J. CARTER, Chief Judge.

Petitioner was a prisoner in "B-Section" at San Quentin State Prison when he filed his petition for writ of habeas corpus praying transfer to the general prison population. In August, 1972, he was transferred to Palm Hall, California Institution for Men at Chino for "decompression" programming. At present, he is again at San Quentin State Prison in "B-Section" in out-of-court status awaiting the outcome of this proceeding.

Petitioner was convicted in the Los Angeles County Superior Court for second degree murder. He is not challenging his conviction, but attacks his confinement in "B-Section" at San Quentin which he has previously unsuccessfully contested in state habeas petitions. In its Order dated August 23, 1972, this Court rejected resondent's arguments that federal habeas was not an appropriate vehicle to effectuate a change in petitioner's custodial confinement and that a segregated placement fails to reach federal constitutional dimensions. Shortly after petitioner was transferred to Palm Hall, respondent filed a supplemental return contending that the relief prayed for was now moot. In its Order dated September 28, 1972, the Court found that the matter was not moot and ordered an evidentiary hearing. Such

hearing was held on November 15, 1972, at which time the petitioner and other witnesses testified and exhibits were introduced and admitted into evidence. Petitioner and respondent have filed post-hearing briefs and reply briefs.

The Court has carefully reviewed all records, documents, exhibits and the testimony adduced at the hearing.

## I.

█ Respondent contends as a preliminary matter that the issue before the Court is limited to whether petitioner's classification to undergo "decompression" at Palm Hall is proper and that the validity of his earlier classification to "B-Section" at San Quentin should not be considered. The issues cannot be so artificially separated. Adverse collateral effects from his segregated confinement may remain to vex petitioner in the future, e. g., subsequent classification, parole consideration, etc. The Court therefore rejects any arbitrary limitation on the scope of the inquiry. See West v. Cunningham, 456 F.2d 1264 (4th Cir. 1972); Black v. Warden, 467 F.2d 202 (10th Cir. 1972).

## II.

The facts surrounding petitioner's confinement are complicated and will therefore be set out at length. It appears that petitioner began serving his sentence as a member of the mainline prison population. During that time he received several favorable reports on his behavior from correctional officers. (Petitioner's Exh. 1). On July 30, 1970, while he was at Soledad State Prison, he became a suspect in the killing of a correctional officer and was placed in the adjustment center. He remained there until February 2, 1971, when charges against him for the officer's death were dismissed for lack of evidence. He was transferred to San Quentin State Prison "because of serious complications that the dropping of this charge presents with managing these four men in the same facility in which we are managing the other three men still charged." (Petitioner's Exh. 3). He was thereupon confined in the segregated unit, "B-Section".

Petitioner's segregated confinement at Soledad is not in dispute, but what happened at San Quentin after his arrival on February 3, 1971, provides the gist of this action.

On February 23, 1971, a Classification Committee referred petitioner to the Associate Warden-Custody "for release consideration . . ." The Committee noted that petitioner *should* be retained in administrative segregation, but that "due to the fact that that case is still pending against three inmates, the Committee feels that the decision should be made at a higher level as to proper placement of this man." (Petitioner's Exh. 3). He was not released, for Warden Nelson of San Quentin, in a memorandum dated March 4, 1971, to Director Procunier stated: ". . . Mr. Jacobs, Associate Warden, Custody, decided *not* to release the man so that review in 90 days is the next action to occur." The reason given was that "Mr. Jacobs notes that there is a possibility of reopening the murder charge." (Respondent's Return, Exh's. C and D, *emphasis added*). In April and May, 1971, petitioner was found guilty of institutional violations and was punished with cell status for brief periods. (Respondent's Return, Exh's. E, F, G, H, I and J). These are not discussed here because they are not an issue, and respondent admits petitioner is not a *disciplinary problem* but rather a *management problem*.

Nothing further apparently took place until June 1, 1971, when Mr. Hearnsberger, Classification and Parole Representative at Soledad Prison, wrote the following to Mr. J. O'Brien, his counterpart at San Quentin:

Mr. B. Doran, Chief of Classification Service, has asked that a DRB recommendation for Departmental Interest Designation be prepared on each of

the inmates originally charged with participation in the assault and death of Correctional Officer Shull of CTG-North.

Petitioner's name was one of those included in the list of those charged. (Respondent's Return, Exh. K).

In compliance with this request, Mr. O'Brien wrote to Chief Deputy Director Stutsman on June 10, 1971, referring petitioner to the Departmental Review Board. He reviewed the reasons for referral, characterizing the petitioner as " . . . an active aggressive inmate and his interest centers around his Muslim affiliation and apparent desire to be a leader of this group . . . " Particular attention was called to comments made by the Adult Authority at petitioner's parole hearing on March 24, 1971, viz., petitioner "has no remorse for killing the victim in the committing offense . . . " His significant past criminal history was summarized, and discussion of his departmental history returned to the earlier theme of his "strong desire to be recognized as a militant leader using his Muslim affiliation as the vehicle to challenge rules and regulations . . . " Emphasis was given to petitioner's "strong desires to be sure his relationship to the murder of a correctional officer was recognized by his peers. It seems a necessity to prevent his position as a leader from being challenged. Considering recent behavior and philosophy this man is following there is serious danger to other persons coming in conflict with his militant goals whether inmate or staff." Therefore, it was concluded that "a recommendation as a special case designation as a dangerous and wilful person is necessary at this time to call attention to staff in the future, to handle this man with caution and proper control at all times." (Respondent's Return, Exh. L)

On June 24, 1971, a memorandum was sent under the name of R. E. Doran, Secretary, Departmental Review Board, to Chief Deputy Director Stutsman, which essentially repeated the language of Mr. O'Brien's memorandum and concluded with this notation: "DRB ACTION: DRB met on June 18, 1971, Special Case-Departmental designation approved. Case to be re-evaluated in one year for possible removal of Special Case designation if appropriate at that time." It was approved by Mr. Stutsman. (Petitioner's Exh. 4).

During this time when a Special Case Designation was being applied to petitioner, the Classification Committee at San Quentin met and, on June 7, 1971, requested petitioner's release "so that he can program on the mainline at this institution." The Committee took note of his disciplinary record at San Quentin and that prior criminal charges against all inmates involved in the Soledad officer's killing had terminated. (Petitioner's Exh. 3). While there is no documentary evidence as to the disposition of the Committee's request, on July 7, 1971, a Classification Committee memorandum bearing the notation of "Special Case" and signed by J. R. O'Brien states:

Departmental by DRB on 6–18–71. His criminal records appear to be limited to about 4½ years; but there are considerable indications of assaultive, violent behavior ending with a Murder 2nd conviction. Since 12–31–69 he seems to have developed into an acting-out dangerous militant. Considering recent behavior and the philosophy this man is following there is serious danger to other persons coming into conflict with his militant goals whether inmate or staff. (Petitioner's Exh. 5).

On July 14, 1971, another Classification Committee memorandum dealing with segregation review and signed by R. Golden says:

Two attempts have been made to have Allen released to our general population and these have been rejected by the Associate Warden Custody. The only alternative we would have at this point would be a CIM Palm Hall Recommendation. However, Allen rejects at this time possibility of programming at that institution. Allen is

greatly annoyed that he was sent here from CTE Central. He feels that he is in "B" seetion unjustly and refuses to discuss the possibility of programming elsewhere, maintaining that his situation is a matter for the courts. (Petitioner's Exh. 5).

Subsequent memoranda from the Classification Committee dated September 30, 1971, December 15, 1971 and March 29, 1972; (Petitioner's Exh. 5) for the most part duplicate the July 7, 1971, memorandum and repeat the need for petitioner to undergo a "decompression" program at Palm Hall.

Lastly, there is a resume and evaluation of petitioner contained in the Adult Authority and Parole Release Referral Report prepared by Joe S. Ware, CCI, as of February 4, 1972 (Petitioner's Exh. 7). Without repeating the report, the Court simply notes that it includes language which harks to some of the previous reports, e. g. "DRB and staff are of the opinion that subject is a serious danger to other persons in conflict with his militant goals. Current custody close"; "no remorse for either of the victims." The Evaluation Section of the report is contradictory. Thus, it is said that "Institutional adjustments continue to be poor during the past year," but it is also stated: "Segregation staff note also that subject seems to be cooperating and conforming with not too much trouble." Mr. Ware also comments that petitioner had a "better sense of communication with freeness of expression" and that he was "open to constructive criticism along with counseling and advice." Moreover, it is stated: "Prolonged incarceration has very little to offer this individual with even less in a segregation status." However, he has had little opportunity for pre-release preparation in the past year.

At the evidentiary hearing before this Court, petitioner testified that he was put in segregated confinement at Soledad when he was under investigation for the death of the officer. After dismissal of the charges, he was transferred to San Quentin where he was placed in "B-Section" and he continued there from February, 1971, until August, 1972, when he was transferred to Palm Hall, a period of 18 months. During the time he was in "B-Section" he was locked up for about 23½ hours daily, had to eat all his meals in his cell and could not participate in any of the prison's cultural, social or academic activities. The thrust of his challenge to solitary confinement is therefore the loss of valued privileges of prison life and future parole consideration rather than his having had to endure any shocking or debilitating physical conditions due to close confinement.

Mr. Jerry Golden, correctional counselor at San Quentin, testified that a classification process is employed to determine housing and the degree of custody of each prisoner. A typical classification committee is composed of more than one person and the members confer together when a particular person is to be classified. Considered is the prisoner's inmate background, his history in the Department of Corrections, and disciplinary infractions and reports, both good and poor. Mr. Golden asserted that the system of classification is meant to determine a suitable program for the individual needs of inmates.

Mr. Golden was the recorder at petitioner's classification hearing that determined his assignment to Palm Hall in August, 1972. He stated that the internal reports which characterized petitioner as a "black militant" and "revolutionary", and the fact that he had been suspected of killing the guard at Soledad were all taken into consideration in ascertaining petitioner's classification. Other facts stressed were the petitioner's psychiatric reports compiled from his initial admission to the California Department of Corrections, a sociological background evaluation, and petitioner's criminal record. All these materials, according to Mr. Golden, established that petitioner was disruptive, hostile, aggressive, and potentially assaultive— that is, a *management problem* rather than a disciplinary one. Emphasizing

**510**

petitioner's criminal record of assaultive offenses and the lack of remorse for the murder of which he had been convicted, the Committee concluded that petitioner should be sent to a decompression unit such as Palm Hall.

Neither the internal reports nor the psychiatric reports to which Mr. Golden referred were made available at the hearing. Respondent did not offer any additional evidence justifying petitioner's segregated confinement up to the time of the Palm Hall classification hearing. Indeed, respondent had continually emphasized the reasons for petitioner's transfer to Palm Hall and the conditions existing there. He has not addressed himself to any great extent to whether there was a rational basis for petitioner's confinement in "B-Section" at San Quentin.

Petitioner attended some of the Classification Committee hearings wherein he responded to questions from members of the Classification Committee, but petitioner did not present testimony on his behalf or confront his accusers.

### III.

At issue, therefore, is the legality of petitioner's prolonged confinement in "B-Section". Petitioner alleges, *inter alia*, that such confinement, in the circumstances of this case, constitutes cruel and unusual punishment as proscribed by the Eighth Amendment to the United States Constitution. In order to evaluate properly petitioner's claim in this regard, it will be necessary for the Court to survey briefly the case law which has developed under this theory as it relates to solitary confinement.

The courts have generally upheld solitary confinement as a penological device. *E. g.*, Sostre v. McGinnis, 442 F. 2d 178, 192 (2d Cir. 1971); Krist v. Smith, 439 F.2d 146 (5th Cir. 1971); Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970); Graham v. Willingham, 384 F.2d 367 (10th Cir. 1967). It has not gone unquestioned, however, when the courts have been faced with particularly egregious circumstances. Such decisions have been based on constitutional standards which are not always clear. Three groups of cases seem to have evolved in the area of solitary confinement as cruel and unusual punishment.

One group of decisions can be classified as those in which the physical conditions are determined to be so shocking and barbarous that the confinement amounted to cruel and unusual punishment.[1] Generally speaking, these are extreme cases where substantial deprivations of human liberties have occurred. As Justice Douglas stated in Robinson v. California, 370 U.S. 660, 676, 82 S.Ct. 1417, 1425, 8 L.Ed.2d 758 (1962), the purpose behind such judicial intervention was to express "the revulsion of civilized man against barbarous acts— the 'cry of horror' against man's inhumanity to his fellow man."

Petitioner's case does not fall in this first category; he has shown no conditions which are "shocking" or "barbarous".

Another group of cases revolve around the formula that a particular solitary confinement constitutes levying a disproportionate penalty against the prisoner.[2] This test is derived from

---

[1]. Epochal cases where confinement was held cruel are: Wright v. McMann, 387 F.2d 519 (2nd Cir. 1967); Knuckles v. Prasse, 435 F.2d 1255 (3rd Cir. 1971); Holt v. Sarver, 442 F.2d 304 (8th Cir. 1971); Hancock v. Avery, 301 F.Supp. 786 (M.D.Tenn.1969); Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966); Jones v. Wittenberg, 323 F.Supp. 93 (N.D.Ohio 1971); and Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971). The common characteristics are often nudity, overcrowding, inadequate food and water, no heat, absence of medical care, unjustified brutality and lack of proper sanitation. *Cf.*, Gray v. Creamer, 465 F. 2d 179, 187 (3rd Cir. 1972). See generally Note, "Recent Application of the Ban on Cruel and Unusual Punishments", 23 Hast.L.J. 1111, 1115–1123 (1972).

[2]. An analysis using this approach is advanced in Wheeler, "Toward a Theory of Limited Punishment—An Examination of the Eighth Amendment", 24 Stan.L.Rev. 838 (1972).

Weems v. United States, 217 U.S. 349, 368, 30 S.Ct. 544, 54 L.Ed. 793 (1910). In fact, the language of the Eighth Amendment itself is expressed in words of proportionality. Thus, where punitive segregation is imposed for violation of prison rules, the issue often becomes whether the prison penalty is disproportionate to the offense.[3] Essentially, the court balances the harm produced by the prisoner's conduct against the deprivations suffered by the prisoner when punished. Depending on the values applied to varying conduct, courts will differ. But here petitioner was not incarcerated in "B-Section" at San Quentin as punishment for committing a prison infraction, and so this test provides no direct aid in analyzing petitioner's claim.

A third test developed by some courts is whether the punishment meted out by the prison administrator was arbitrary or capricious. *E. g.,* Roberts v. Pegelow, 313 F.2d 548, 550–551 (4th Cir. 1963); Black v. United States Warden, 467 F.2d 202 (10th Cir. 1972); Dreyer v. Jalet, 349 F.Supp. 452, 482 (S.D.Tex.1972). The objection to this test is that it provides no guideposts; a court makes a subjective determination after the particular event as to whether a prison official overstepped an unspecified line of permissible conduct. "The determination of impropriety . . . turns upon the peculiarities of each factual situation under scrutiny." Dreyer v. Jalet, *supra* at 482.

These different tests, while offering some guidance, provide no uniformity in how to measure "excessive cruelty". Perhaps the uncertainty is the result of the endless variety of factual situations which face prison administrators. Ad-

mittedly, a phrase such as cruel and unusual punishment is not susceptible to easy categorization. Perhaps the unsureness of courts is shown by the fact that they tend often to employ these tests alternatively or in combination rather than to agree on what is the unconstitutional minimum. *E. g.,* Meyers v. Alldredge, 348 F.Supp. 807 (M.D.Pa. 1972).

The difficulty is compounded when prison authorities seek to differentiate the justification for "punitive" as contrasted with "administrative" segregation. While prison administrators recognize a distinction,[4] the result is often identical. Courts have realistically avoided falling into this semantic trap.[5] Certainly, the facts here illustrate the folly of concluding that a difference necessarily exists. The lengthy period of close confinement endured by petitioner without any defined limit is indistinguishable from additional punishment meted out for a disciplinary infraction.

In searching for a principle of more universal application under which to subsume the plethora of factual situations which might bring into play the 8th Amendment's proscription of cruel and unusual punishment, the Court begins with Judge Merhige's notion that "[d]eprivations of benefits of various sorts may be used so long as they are related to some valid penal objective and substantial deprivations are administered with due process." Landman v. Royster, 333 F.Supp. 621, 645 (E.D.Va. 1971); *see also:* Dearman v. Woodson, 429 F.2d 1288, 1290 (10th Cir. 1970) and cf. Schmitt v. Crist, 333 F.Supp. 820, 822 (E.D.Wis.1971). Such deprivations may consist of being denied earning money, food, access to media, library

---

3. The amount of time spent in solitary confinement is an integral element to be considered in determining if the punishment was proportional to the offense. *See* Howard v. Smyth, 365 F.2d 428 (4th Cir. 1966); Fulwood v. Clemmer, 206 F.Supp. 370, 379 (D.D.C.1962); and In re Hutchinson, 23 Cal.App.3d 337, 100 Cal. Rptr. 124 (1972).

4. Manual of Correctional Standards, issued by the American Correctional Association (Fourth Printing 1969), at 413–414.

5. *E. g.,* United States ex rel. Walker v. Mancusi, 467 F.2d 51 (2d Cir. 1972), 338 F.Supp. 311, fn. 1 at 317 (W.D.N.Y. 1971); Howard v. Smyth, 365 F.2d 428, 429 (4th Cir. 1966); Smoake v. Fritz, 320 F.Supp. 609 (S.D.N.Y.1970).

privileges, educational programs, daily baths, use of recreational facilities and so on, all of which make confinement more restrictive than that of inmates in the prison population at large.

 While much weight should be given to the determination of prison administrators that the deprivation of privileges is required in the particular case, the Court feels it must be bottomed on a showing of a reasonable relationship between the necessity to limit the liberty of the prisoner and the accomplishment of a legitimate penal aim. Thus, administrative segregation has been approved for a particularly violent offender,[6] or one who is classified as an escape risk,[7] or one who is likely to provoke a prison rebellion.[8] On the other hand, reasons such as refusal to answer questions,[9] or labeling prisoners as agitators [10] are not enough. Talismanic labels such as "protection", "threat to security" [11] and the like cannot serve to validate solitary confinement unless prison officials can point to more specific penal objectives when they are faced by a legal challenge. Such a justification is a burden necessarily placed on prison administrators when they seek to establish a rational basis for administrative segregation. Therefore, "when it is asserted that certain disabilities must be imposed . . . [the] courts may still inquire as to the actuality of a relation between means and end. The test of necessity will . . . be more stringent when a deprivation of a fundamental constitutional right is involved."

Landman v. Royster, *supra*, 333 F.Supp. at 645.

If petitioner's claim is tested by the standard above enunciated, this Court finds that his confinement to "B-Section" was illegal.

There is no contention that his initial segregated confinement at Soledad Prison was improper. He was a suspect in the killing of a correctional officer and the exigencies of that situation, as well as his own protection, justified removal from the prison population. *See* Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970). *See also* Urbano v. McCorkle, 334 F.Supp. 161, 168 (D.N.J.1971); Biagiarelli v. Sielaff, 349 F.Supp. 913, 917 (W.D.Pa.1972).

Even when petitioner was transferred to San Quentin Prison, his confinement in "B-Section" was valid inasmuch as the prison officials there had not had an opportunity to classify him as to the appropriate custody. But then he was never told why he was being confined nor was he informed of how long he would remain in segregation.[12] His prolonged solitary confinement despite two recommended releases to the general population by the Classification Committee was not based upon any showing other than vague assertions of being an "active, aggressive inmate" and having "indications of assaultive, violent behavior". These labels, which are stated in the Special Case Designation to be applied to petitioner in his prison records, fail to constitute a rational justification

---

6. *E. g.*, Graham v. Willingham, 384 F.2d 367 (10th Cir. 1967); Royal v. Clark, 447 F.2d 501 (5th Cir. 1971).

7. *E. g.*, Krist v. Smith, 309 F.Supp. 497 (S.D.Ga.1970), aff'd., 439 F.2d 146 (5th Cir. 1971).

8. *E. g.*, Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970), Fulwood v. Clemmer, 206 F.Supp. 370, 379 (D.D.C.1962), Wilson v. Kelley, 294 F.Supp. 1005 (N.D.Ga. 1968), aff'd. 393 U.S. 266, 89 S.Ct. 477, 21 L.Ed.2d 425 (1968).

9. Howard v. Smyth, 365 F.2d 428 (4th Cir. 1966).

10. Armstrong v. Bensinger, 11 Cr.L.Rep. 2334 (N.D.Ill.1972).

11. See Landman v. Royster, *supra*, 333 F. Supp. at 645.

12. In the Manual of Correctional Standards, *supra*, at 418, it is stressed that segregation should be for the shortest period that will accomplish the desired result. Punitive segregation should not exceed thirty days. Administrative segregation is indicated to have a time limit of thirty to ninety days. Here petitioner was in segregated confinement in "B-Section" from February, 1971, to August, 1972.

for continued confinement in "B-Section".[13]

■ In summary, once the basis for his initial segregation was dissipated by the dismissal of charges that he was involved in the death of the Soledad officer, no further concrete evidence was brought forward in the exhibits or the oral testimony before the Court which has any bearing on or connection with a valid penal objective. There was no showing that petitioner participated in a prohibited prison activity, or committed regulatory infractions, or was involved in *overt* problem behavior, any of which activities might support continued confinement. In fact, since he has been in "B-Section" he has had simply no opportunity to engage in activities which might conceivably justify *indefinite* segregation. The labels of militancy and dangerousness to others are seemingly founded on the previous episode at Soledad. These are abstractions without foundation in fact as shown by the evidence before the Court.

## IV.

■ An additional and alternative ground for concluding that petitioner has been unconstitutionally confined in "B-Section" is the absence of any procedural safeguards afforded to petitioner when respondent refused to release him to the general prison population at San Quentin. The determination to keep petitioner in "B-Section" was apparently reached by higher authorities. *See* discussion of facts herein, *supra*. However, petitioner was never provided with any statement of the reasons for this decision, nor given any opportunity to refute them if they existed. Moreover, the Special Case Designation, which appears to have had a decisive bearing on petitioner's future custodial confinement because it blocked consideration of his eligibility for release to the general population, was approved without any hearing or opportunity for petitioner to be heard. As petitioner points out, he was not even aware of the existence of this designation until respondent filed its Return in this action. The requirement of procedural [14] safeguards under these circumstances has been amply set forth in numerous cases in the past several years and does not call for any elaborate repetitive discussion.

The minimal safeguards are generally held to be notice and a hearing. A fuller compilation includes an impartial tribunal, a hearing, written confrontation and cross-examination of witnesses and a written decision. Whichever requirement of minimal due process is adopted, there is no doubt that petitioner received neither. Consequently, petitioner was denied substantial prison rights without due process.

## V.

For the above reason, the Court finds as follows:

1. Petitioner has been unconstitutionally confined in "B-Section" at San Quentin State Prison; and

2. Petitioner was denied procedural Due Process rights during such confinement.

13. See Footnote No. 3.

14. Procedural due process for inmates in the context of justifying segregated confinement has been recognized and adjudicated in many very recent cases. A rudimentary due process procedure is set forth in Sostre v. McGinnis, 442 F.2d 178, 198, 203 (2nd Cir. 1971) [adhered to in United States ex rel. Walker v. Mancusi, 467 F.2d 51, 53 (2nd Cir. 1972)]; Wright v. McMann, 460 F.2d 126, 130 (2nd Cir. 1972). *See also* Gray v. Creamer, 465 F.2d 179, 185 (3rd Cir. 1972)—necessity of giving notice and a hearing. *Accord*: Urbano v. McCorkle, 334 F.Supp. 161, 168 (D.N.J.1971); Biagiarelli v. Sielaff, 349 F.Supp. 913, 917 (W.D.Pa.1972). A more complete panoply of rights, although not fully a trial type hearing afforded one accused at trial, is specified in United States ex rel. Neal v. Wolfe, 346 F.Supp. 569, 574–575 (E.D.Pa.1972). *See also*: Bundy v. Cannon, 328 F.Supp. 165 (D.Md.1971).

In the analogous situation of prison disciplinary procedures, see Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal. 1971).

Accordingly, it is ordered that the petition for writ of habeas corpus be, and the same is, hereby granted, and petitioner is directed to be immediately released to the general prison population in a prison to be selected by the prison authorities.

It is further ordered that petitioner shall not suffer any further disability by reason of any prior determinations as to his unsuitability to be confined in the general prison population.