Maurice **FITZGERALD**, Plaintiff,

v.

Raymond **PROCUNIER**, Individually and in his official capacity as Director of the California Department of Corrections, et al., Defendants.

No. C–74–1969–CBR.

United States District Court, N. D. California.

May 7, 1975.

Susan B. Kaplan, San Francisco, Cal., for plaintiff.

Evelle J. Younger, Atty. Gen., Jack R. Winkler, Edward P. O'Brien, Karl S. Mayer, Kenneth C. Young, San Francisco, Cal., for defendants.

## MEMORANDUM OF OPINION AND ORDER

RENFREW, District Judge.

Plaintiff, in custody at San Quentin State Prison, brought this civil rights action under 42 U.S.C. § 1983 against the Director of the California Department of Corrections, the Warden of San Quentin State Prison, and the California Adult Authority. Plaintiff sought a declaration that his rights had been violated under the Eighth and Fourteenth Amendments to the Constitution, as well as injunctive relief designed to cure the effects of the alleged violations. This action comes before the Court on defendants' motion to dismiss with respect to certain named individual defendants and defendants' motion for summary judgment.

Plaintiff was found guilty of participating in an assault on other inmates by a prison disciplinary committee which meted out punishment for that offense. As a result of the finding by the disciplinary panel, a separate classification committee assigned plaintiff to administrative segregation, where he remains to date.

The complaint sets forth three somewhat overlapping and interrelated claims. First, plaintiff alleges that he was not afforded due process at his disciplinary proceeding. In a separate paragraph, he also claims: "Further punishing plaintiff in the classification while failing to provide him due process is a further violation of the 14th Amendment causing him to suffer further grievous loss." At oral argument counsel for defendants stated that it was his understanding that the only due process violation alleged with respect to the classification was that it was based on an invalid finding of the disciplinary committee. In response to a question from the Court, counsel for plaintiff apparently conceded this point. While the claim is poorly drafted and ambiguous and counsel have apparently restricted its intended scope, the Court declines to accept that restriction. Defendants are seeking summary judgment and plaintiff is a prisoner in segregation. Accordingly, and in light of plaintiff's third claim, the Court will construe the second claim as an independent due process attack on plaintiff's initial classification and continuing assignment to administrative segregation. In his third claim, plaintiff alleges that "[d]efendants have inflicted cruel and unusual punishment on plaintiff * * * by punishing plaintiff without allowing him to defend himself and continuing to arbitrarily punish him without explicitly informing him of the reasons for the punishment or the total extent of punishment to be inflicted." To the extent that this claim actually raises due process objections to plaintiff's segregation, the Court has treated them as such under the second claim.

Upon consideration of the briefs, exhibits and arguments of counsel, and construing the record in the light most favorable to plaintiff, and for the reasons stated below, the Court grants defendants' motion for summary judgment with respect to plaintiff's first and third claims. With respect to plaintiff's second claim, the motion is granted on the issue of plaintiff's initial reclassification and denied on the issue of plaintiff's continuation in segregated status. The motion to dismiss is granted with respect to certain named defendants.

## I. *Statement of Facts*

On June 2, 1974, an incident involving several racial assaults on prisoners took place on the third tier of the East Block Housing Unit at San Quentin. At least three white prisoners suffered knife wounds. On June 3, 1974, plaintiff, a black, was placed in administrative segregation in the North Block Housing Unit. On June 4, 1974, plaintiff received a Rules Violation Report, known in common parlance as a CDC 115, and a Supplemental Report. The CDC charged plaintiff with "conduct which lead [sic] to violence". The Supplemental Report stated: "At approximately 4:25 PM on 2 June, 1974, on the third tier Bayside of the East Block Housing Unit, a group of fifteen (15) to twenty (20) black inmates began running the length of the tier stabbing and assaulting white inmates." The Supplemental Report also contained the names of four victims and seventeen suspected assailants, including plaintiff.

Plaintiff was assigned an investigating officer to whom he provided a list of approximately ten witnesses who could attest to his presence on the first tier at the time of the incident. The investigating officer submitted a report of the incident on June 10, 1974. Plaintiff appeared at a meeting of the disciplinary committee on June 14, 1974. Prior to that date the decision was made not to refer the matter to the district attorney for Marin County. The committee decided that further investigation was necessary and, at plaintiff's request, appointed a new investigating officer. Plaintiff provided his new officer with a list of witnesses as to his whereabouts at the time of the incident in question.

On June 21, 1974, plaintiff again appeared before the disciplinary committee. His investigator reported that plaintiff's witnesses had confirmed his alibi, but that the victims had positively identified him as a participant in the June 2 incident. The committee found plaintiff guilty and sentenced him to five days in isolation, with credit for time served, and thirty days' loss of privileges. They further referred him to the Full Classification Committee. At some time prior to June 23, 1974, plaintiff received a completed copy of the original CDC 115, informing him of the disciplinary committee's disposition. He also received a copy of his second investigator's report which named the victims who had identified him. On June 26, 1974, after a brief appearance by plaintiff, the Full Classification Committee assigned him to administrative segregation "for further observation", to be reviewed in 120 days. Plaintiff's status was subsequently reviewed by either the Sub-Classification Committee or individual correctional officers on July 16, August 28, September 27, October 1, and December 24, 1974. Plaintiff's status was reviewed by the Full Classification Committee on January 2, 1973, approximately 180 days after the initial classification. Plaintiff continues to be housed in segregation which includes greatly increased cell confinement, severe curtailment of privileges, denial of work, and the imposition of handcuffs and increased supervision during visits.

## II. *Plaintiff's Claim of Denial of Due Process at the Disciplinary Proceeding*

Plaintiff complains of a denial of procedural due process at his June 21, 1974, disciplinary hearing, specifically the lack of adequate notice and an opportunity to call witnesses. A threshold question is what were the standards of due process applicable to prison disciplinary proceedings on June 21, 1974, in light of the non-retroactivity of Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Prior to April 25, 1974, there was no definitive decision setting forth the procedural safeguards to be utilized in prison disciplinary proceedings in this Circuit. However, at a minimum, prisoners facing significant sanctions were to be afforded notice and a hearing. Allen v.

Nelson, 354 F.Supp. 505, 513 (N.D.Cal. 1973), aff'd per curiam, 484 F.2d 960 (9th Cir. 1973).

■ On April 25, 1974, the Court of Appeals for this Circuit spelled out with considerable precision the due process rights to be afforded prisoners, including *inter alia* the right to written notice and the right to present witnesses subject to certain limitations. Clutchette v. Procunier, 497 F.2d 809, 818–820 (9th Cir. 1974). The defendants in that case timely filed a petition for rehearing which was still pending on June 26, 1974, when the Supreme Court handed down its decision in *Wolff, supra,* which established narrower due process rights than those set forth in *Clutchette.* On July 29, 1974, the Court of Appeals granted defendants' petition for rehearing restricted solely to the issue of *Wolff's* impact on the prior decision. On October 21, 1974, the Court of Appeals rendered its opinion on rehearing. Clutchette v. Procunier, 9 Cir., 510 F.2d 613. The court modified parts of the earlier opinion to conform with *Wolff* and reaffirmed it in all other respects, including the right to present witnesses and to have adequate notice. On December 24, 1974, the court held that its "decision in *Clutchette* shall only be applied prospectively". Wheeler v. Procunier, 9 Cir., 508 F.2d 888 (Second Revised Opinion on Rehearing). The question thus presented is whether the due process rights which were reaffirmed in October attached as of April 25 and hence would apply to a disciplinary hearing held on June 21. This Court concludes that they did not.

On June 21, 1974, the mandate in *Clutchette* had been stayed awaiting a decision on the petition for rehearing. Defendants were under no duty to institute new procedures conforming to that opinion, since a decision on rehearing might have mandated very different requirements. Had there been no petition for rehearing or had the petition been denied prior to June 21, 1974, defendants might be deemed to be put on notice that continued reliance on past procedures in such hearings was not justified. However, where, as here, there was a pending petition for rehearing, defendants need not be required to comply with the standards established even though those standards may have been ultimately reaffirmed.[1]

■ While the specific safeguards outlined in *Wolff* and *Clutchette* do not apply to the disciplinary hearing of June 21, 1974, plaintiff was entitled to adequate notice of the charges against him and a hearing which afforded him a meaningful opportunity to present his case. See Allen v. Nelson, 354 F.Supp. 505, 513 (N.D.Cal.1973), aff'd per curiam, 484 F.2d 960 (9th Cir. 1973); Sostre v. McGinnis, 442 F.2d 178, 198, 203 (2d Cir. 1971).

■■ With respect to notice, plaintiff admits receiving the CDC 115 and the June 3 Supplemental Report referred to above. Adequacy of notice has generally been held to require informing the inmate of the case against him with sufficient detail to enable him to contest its basis. Palmigiano v. Baxter, 487 F.2d 1280, 1284 (1st Cir. 1973). Assuming the interpretation of the Supplemental Report most favorable to plaintiff, that it merely identified certain victims and other alleged participants in the offense without actually specifying who had linked plaintiff to the incident, plaintiff still had adequate notice, since his defense was that he was elsewhere at the time. While it may be desirable for prison authorities to furnish more specific information, especially where, as

1. Defendants offer statistics from 1973 which indicate that approximately 3,000 disciplinary hearings might have taken place throughout the state during the 2-month period between the first *Clutchette* decision and the disciplinary hearing involved here. However, the statistics do not specify how many of these hearings actually involved sanctions serious enough to invoke the due process requirements of *Wolff.* *See* 418 U. S. 571–572, n. 19, 94 S.Ct. 2963.

here, they later furnish such information, including names of accusers, the failure to do so cannot be deemed a denial of due process.[2]

■ Plaintiff claims that his inability to present witnesses prevented him from presenting his case in a meaningful way. The Court, therefore, must determine from all the proceedings whether plaintiff's hearing was a mere farce or formality violative of due process. On two separate occasions, plaintiff was permitted to explain his whereabouts at the time of the incident and to testify to the names of witnesses who could support his alibi. His investigator, a staff member, reported, albeit briefly, that plaintiff's witnesses had indeed corroborated his story. The committee declined to hear plaintiff's witnesses and chose to believe the victims who had positively identified him as an attacker. Certainly, plaintiff's witnesses would have made a greater impact if they had appeared personally. Possibly, the disciplinary committee was overly concerned with considerations of administrative convenience. However, pre-*Wolff* and pre-*Clutchette*, it cannot be said that plaintiff's opportunity to be heard did not comport with due process.

■ Plaintiff also complains that no one acted as his advocate. Even under the expanded view of due process expressed in Wolff and Clutchette, the right to counsel substitute is limited to situations where the inmate is illiterate or incompetent or unable to cope with complex legal or factual issues. *Wolff, supra,* 418 U.S. at 570, 94 S.Ct. 2963. Plaintiff is neither illiterate nor incompetent and his defense hinged on a simple question of his whereabouts during an incident of violence. No due process right was infringed by the failure to provide him with an advocate.

Plaintiff's June 21, 1974, disciplinary hearing was conducted in accordance with standards of procedural due process applicable at that time. Defendants' motion for summary judgment is granted with respect to any and all claims arising out of an asserted denial of due process at that hearing.

### III. *Plaintiff's Claim of Denial of Due Process in his Re-classification*

■ The Court has construed plaintiff's complaint as raising due process objections to his assignment to and continuation in administrative segregation. In so far as these objections are based on any alleged lack of due process at the disciplinary proceeding, they are, of course, foreclosed by the grant of summary judgment on that issue. It is not clear to what extent plaintiff objects to the lack of procedural safeguards at the June 26 classification hearing, but in light of the fact that plaintiff personally appeared on June 26 and received advance written notice by means of the completed CDC 115, the Court finds that plaintiff was afforded due process in the initial classification. However, fairness afforded at the outset cannot insulate prison officials from the duty to provide periodic reviews which also conform to due process standards, where the classification is indefinite in term. Bowers v. Smith, 353 F.Supp. 1339, 1346 (D.Vt. 1972). Because the record, as discussed below, raises rather than resolves questions of the due process afforded plaintiff in his continuation in segregation, the motion for summary judgment as to this claim will be denied.

Defendants attached to their motion institutional rules and regulations governing administrative segregation. Chapter V on Security Housing Units provides that the Full Classification Committee (or Institution Classification Committee) will review each inmate on retained status at intervals of 120 days or less. However, after the initial review, the Committee may schedule an inmate for his next regular review at up

---

**2.** Due process, of course, does not require prison officials to ignore the possibility of reprisals in such cases.

to 180 days, if the inmate appears likely to be retained in security housing for that period. This review is to be a personal appearance unless the inmate refuses or his mental condition makes it impossible. At the hearing, the decision made and its rationale should be discussed with the inmate. Following the hearing, the Committee is required to prepare a CDC 128–G including either a delineation of the reasons necessitating continued security housing or a reference to another CDC 128–G delineating such reasons if they remain current.

Plaintiff's Classification Committee review took place on January 2, 1975, some 180 days after his initial classification, although his initial classification set forth a 120-day review. On January 2, 1975, the Committee filed a CDC 128–G which read in pertinent part: "Subject was denied transfer on the basis of pending court action. Committee could see no alternative to retaining subject in Segregation with recommendation that case be reviewed again after completion of court action." [3] In plaintiff's March 3, 1975, affidavit, he states: "I have been given no additional reasons for my confinement there except that the classification committee won't consider my case until my legal action is complete."

Counsel for defendants speculates that plaintiff's statement might be based upon the summary wording of the CDC 128–G, thus implicitly admitting that no other reasons for plaintiff's continued segregation were discussed with him at a hearing as mentioned by the prison rules. After offering this explanation for plaintiff's alleged misunderstanding, counsel for defendants submits that the plain meaning of the CDC 128–G is that the Classification Committee concluded that for security reasons plaintiff should be retained in segregation and that any

review held after completion of this case would be an additional review. Defense counsel's interpretation is plausible, but hardly plain, and on defendants' motion for summary judgment, exhibits will be viewed in a light most favorable to plaintiff.

So viewing the January 2 CDC 128–G, the Court arrives at two possible interpretations. The least favorable to defendants is that the Classification Committee deferred consideration of plaintiff's status pending the close of this action. Plaintiff declares in his most recent affidavit, dated April 10, 1975, that he was so informed by the committee at the January 2 meeting. If proven, such a course would clearly be an unconstitutional interference with plaintiff's right of access to the courts. *See* Johnson v. Avery, 393 U.S. 483, 485, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969).

The second possible interpretation is that the Committee, however sound its internal reasoning, failed to make an adequate record of the reasons for continuing segregation, such that would reasonably inform plaintiff, the Adult Authority, future Classification Committees, prison officials, or any other person who might be reviewing plaintiff's conduct. As the Supreme Court said in *Wolff* in the analogous situation of prison disciplinary proceedings:

"Written records of proceedings will thus protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding. Further * * * the provision for a written record helps to insure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts, where fundamental constitutional rights may have been abridged, will act fairly." 418 U.S. at 565, 94 S.Ct. at 2979.

---

3. Due to the closing of "B" Section at San Quentin, plaintiff had been scheduled to transfer to "O" Wing of the Correctional Training Facility at Soledad, California. At the request of plaintiff's counsel, the transfer was temporarily stayed. The first sentence of the CDC 128–G is probably a reference to this incident. The transfer was subsequently rescinded when the closing of "B" Section was delayed.

For example, it may well make a difference for the Adult Authority to know that plaintiff was continued in segregation because officials concluded that he was likely to engage in further assaultive conduct or because they feared disruptive reprisals against him or because of some new, unreported behavior, or any combination of these. The CDC 128–G of January 2, 1975, gives no indication as to which of these the Committee acted upon, although earlier reports of plaintiff's conforming behavior would seem to exclude the third possibility.

■ Whichever interpretation of the CDC 128–G is adopted, a serious question remains as to whether plaintiff was afforded due process in his continuing classification, especially as defendants have apparently failed to comply with their own rules in several respects. Hence, defendants' motion for summary judgment is denied with respect to alleged due process violations in plaintiff's continued assignment to administrative segregation. If there are other records or evidence which bear upon this question, defendants must renew their motion for summary judgment and bring these new items to the attention of the Court.

IV. *Plaintiff's Cruel and Unusual Punishment Claims*

■ Punishment which is disproportionate to the offense committed is cruel and unusual. Weems v. United States, 217 U.S. 349, 367–368, 377, 381, 30 S.Ct. 544, 54 L.Ed. 793 (1910). Defendants claim that plaintiff's confinement is "administrative" and hence not punitive, rendering this standard inapplicable. Clearly, where no disciplinary infraction has been committed, there can be no relationship, disproportionate or otherwise, between the offense and the confinement. But where, as here, the reports on plaintiff's segregated status refer repeatedly and almost exclusively to the June 2 incident, the Court may

look behind the defendants' characterization of its action in determining the true nature of the confinement. Allen v. Nelson, 354 F.Supp. 505, 511 (N.D. Cal.1973), aff'd per curiam, 484 F.2d 960 (9th Cir. 1973); *see* Adams v. Carlson, 368 F.Supp. 1050, 1052–1053 (E.D. Ill.1973). Construing defendants' exhibits most strictly against them, this Court could find that plaintiff's "administrative" segregation was actually "additional punishment meted out for a disciplinary infraction." 354 F.Supp. at 511. However, taking into account the seriousness of the offense plaintiff was found to have committed, this Court could not hold that nine months in segregation was so disproportionate as to constitute cruel and unusual punishment. *But see* Adams v. Carlson, *supra*, 368 F. Supp. at 1053, on remand from 488 F.2d 619, 635, 636, n. 32 (7th Cir. 1973) (sixteen months in segregation disproportionate punishment for participation in prison work stoppage).

■ Neither do the conditions of plaintiff's confinement fall so far below civilized norms as to rise to an Eighth Amendment violation. It is well settled that isolation, segregation or maximum security are not *per se* violations of the proscription against cruel and unusual punishment. O'Brien v. Moriarty, 489 F.2d 941, 944 (1st Cir. 1974); Sostre v. McGinnis, *supra*, 442 F.2d at 192.

Accepting the statements in plaintiff's affidavits and the uncontradicted statements in the affidavit of J. V. Yoder, Program Administrator in charge of Security Housing Units, the following picture of plaintiff's segregation emerges. Plaintiff is confined to a cell approximately 10' 9" long, 4' 5" wide and 7' 4½" high, containing a bed, shelf, 60-watt lightbulb, toilet, and sink with running hot and cold water. Plaintiff is allowed at least occasional showers and is permitted outside his cell for brief exercise periods (45 minutes to an hour) two or three times a week. Plaintiff is not allowed to work, to have hobby materials

or personal property. He is not permitted to attend religious services, but a chaplain makes irregular rounds. He is not permitted to go to the library, but he may order books. During visits, plaintiff's hands are handcuffed and he can only communicate through a plexiglass and wire mesh screen. While plaintiff's residue of freedom has been severely constricted, he has not been subjected to those physical indignities, health hazards or other severe physical hardships which courts have found to constitute cruel and unusual punishment. *See, e. g.*, Wright v. McMann, 387 F. Supp. 519, 526 (2d Cir. 1967); Jordan v. Fitzharris, 257 F.Supp. 674, 676–678 (N.D.Cal.1966). Hence, defendants' motion for summary judgment will be granted on the claim of cruel and unusual punishment.

## V. *Defendants' Motion to Dismiss*

Originally, this complaint named the California Adult Authority as a defendant. By order dated December 31, 1974, defendants' motion to dismiss was granted with respect to defendant California Adult Authority. Plaintiff was given leave to amend and on February 10, 1975, filed an amended complaint naming as defendants the individual members of the California Adult Authority. Defendants have now moved to dismiss as to those defendants.

■ The pleadings complain of actions taken by members of the Department of Corrections. The only action complained of with respect to members of the Adult Authority is that they relied in part on the results of plaintiff's disciplinary proceedings in denying him parole, and they are likely to do so again in the future. "The actions of which [plaintiff] complains fall squarely within the quasi-judicial or discretionary duties and functions vested in them by law." Bennett v. People of State of California, 406 F.2d 36, 39 (9th Cir. 1969), cert. denied, 394 U.S. 966, 89 S.Ct 1320, 22 L.Ed.2d 568 (1969). Accordingly, they are immune from suit as to such actions. Furthermore, plaintiff does not allege that defendant members of the Adult Authority would not disregard the original disciplinary committee decision if it were to be reversed. In the absence of special facts or specific allegations, this Court will not assume that duly appointed officials will abuse their discretion. Hence, the complaint is dismissed as to defendants Kerr, Gordon, Hoover, Wood, Garcia, Quevedo, Lynum and Brown for failure to state a cause of action.

Based on the above memorandum of opinion,

It is hereby ordered that this action is dismissed with prejudice for failure to state a cause of action as to defendants Kerr, Gordon, Hoover, Wood, Garcia, Quevedo, Lynum and Brown.

It is hereby further ordered that defendants' motion for summary judgment is granted with respect to any and all claims arising out of asserted deprivations of due process at the June 21, 1974, prison disciplinary proceeding.

It is hereby further ordered that defendants' motion for summary judgment is granted with respect to plaintiff's claims of cruel and unusual punishment.

It is hereby further ordered that defendants' motion for summary judgment is granted on the issue of alleged due process violations at the June 26, 1974, classification hearing.

It is hereby further ordered that defendants' motion for summary judgment is denied with respect to asserted violations of due process in plaintiff's continuation in administrative segregation.