Robbie CRAIG and Charles Hayter, Plaintiffs,

v.

Carl HOCKER, Warden, Nevada State Prison, et al., Defendants.

Civ. No. R–2662 BRT.

United States District Court,
D. Nevada.

Feb. 20, 1975.

---

Charles R. Zeh, Washoe County Legal Aid Society, William K. Lohse, William O'Mara, Reno, Nev. and Paul Lamboley, Reno, Nev., for plaintiffs.

Robert List, Atty. Gen., of Nev., Carson City, Nev., for defendants.

## MEMORANDUM OPINION

BRUCE R. THOMPSON, District Judge.

This is a prisoners' civil rights action which involves many facets of prison administration and discipline of prisoners at the Nevada State Prison. It is a class action and all inmates of the Prison are members of the class.

The action was initiated by a pro se complaint filed in forma pauperis on May 1, 1972. Thereafter, counsel were appointed to represent plaintiffs and the Court desires to express its deep appreciation to counsel and Mr. Charles Zeh in particular for the tremendous amount of work, investigation and research which went into the preparation, trial and briefs of the case. The trial was held in April 1974. Both the named plaintiffs, Robbie Craig and Charles Hayter, testified. Several experts, including psychiatrists and people knowledgeable in prison administration and reform, offered their informed opinions.

During the course of the proceedings, there have been changes, not only in the administration of the Prison but in the staffing. Edwin Pogue has succeeded

Carl Hocker as Warden. A competent physician in internal medicine, a dentist and a psychiatrist have been added to the staff. Other improvements have been made. But the obstacles to humane treatment which are inherent in the character of the physical plant have not changed.

The Nevada State Prison is approximately one hundred years old. The maximum security institution adjacent to Carson City, Nevada, was constructed of stone quarried on the site of the edifice by prisoners. Early in the 1960's, a medium security prison was constructed near Stewart, Nevada, a few miles south of Carson City. Also a women's prison was constructed adjacent to the maximum security facility. The administration of the women's prison is not involved in this action.

The manager of the State Public Works Board testified that the 1973 Nevada Legislature initiated a program with the ultimate objective of abandoning the maximum security prison. An addition to the medium security facility was under construction at the time of trial. Further, plans were being formulated for construction of a new two hundred inmate prison, perhaps in Southern Nevada, and money was appropriated for construction of a thirty-two capacity security unit at the Nevada State Hospital in Reno to house psychotic patients deemed to be unmanageable or dangerous. It depends upon the will of subsequent Legislatures whether additional institutions shall be constructed and staffed to permit the abandonment of the maximum security prison.

■■ A considerable portion of the expert testimony concerned the need for prison reform. The obvious was emphasized that is, that our present system does not work. It neither deters the commission of crime nor reforms the offender. It serves only two ends—to punish the offender and to safeguard society from his criminal activities so long as he is confined. This, however, is a sociological problem within the jurisdic-

tion of the Legislature and does not become a judicial problem unless the means and methods adopted for the care and treatment of persons convicted of crime offend constitutional safeguards. The system of confining convicts in penitentiaries is not itself unconstitutional.

At the time of the trial, there were eight hundred fifty inmates in the Nevada State Prison. Half of these were in the maximum security prison, thirty-four in the women's prison, and the remainder in the medium security facility. This action is not concerned with conditions at the medium security facility or in the administration of that facility except in one respect only, that is, the procedures resulting in the re-transfer of a prisoner from the medium security prison to the maximum security prison. The medium security prison has dormitory housing, high school and college level educational programs, vocational training, hobby crafts, work release programs (N.R.S. 209.483, et seq.), a gymnasium, playing fields and recreational directors.

Initially, all convicts committed to the Nevada State Prison are received at the maximum security prison for orientation, screening and classification. At that institution, there are three general classes of confinement, (1) isolation or punitive segregation, in which ten inmates were confined at the time of trial; (2) maximum housing, which was then harboring about fifty prisoners; and (3) the general population (the yard). Approximately ten trustees in the general population live on the short line, a dormitory outside the main security area. There is also a psychiatric ward or unit which was housing about ten persons, not necessarily inmates. More of this later.

Inmates in the general population are housed mostly in single cells which have bunks with mattresses. There are also three dormitories. There is a toilet and sink in each cell with cold running water. Two sheets, two blankets and a pillow case are supplied and three towels.

One sheet is changed each week. Towels are exchangeable at will. Inmates may shave and shower at will. The inmates eat in the dining hall, three meals a day. Each inmate has clean underclothes, socks, shoes blue denim pants, shirts and jacket. He may supply and wear his own shirt of a specified style. He is permitted to have personal possessions, such as cigarettes, cosmetic supplies, a record player, a television set, books and magazines.

Opportunities for recreation in the yard are limited. There is no gymnasium. An inmate may engage in weight lifting, basketball, volley ball, badminton and soft ball. Hobby crafts consist mostly of leather work and art crafts.

Employment opportunities for general population inmates include culinary work, maintenance work, the license plate factory, the book repair or bindery shop and the plasma program. Good time credits against the sentence may be earned by work. N.R.S. 209.285.

At the time of trial, the prison administration was planning an educational program for these inmates. The recent development of the Western Community College in Carson City has brought about the possibility of an expanded educational program.

Maximum security confinement contrasts with the freedom of the yard. The inmate is locked up in a cell and remains there most of the time. He is fed three times a day in the cell. The morning and late afternoon meals are the standard menu, but the food is usually cold by the time it is delivered. Sandwiches are served in the late evening. The clothing is standard. An inmate may have a radio, record player, television set, books and magazines. There is no employment opportunity, vocational training or educational program, except individual study courses. There is an outside exercise yard adjacent to the maximum security cell block which is seldom used because of insufficient supervisory personnel. A maximum security inmate may use the bullpen, an in-side exercise room, about twice a week for an hour or so. The bullpen is essentially an oversized cell in the cell block, devoid of furniture or exercise equipment except a wooden table. A "max" inmate may take one shower a week, but has running water in his cell and can shave at will.

A sub-class of maximum housing prisoners are prisoners in institutional lockup or administrative segregation. These are prisoners who are classified to this form of confinement primarily for their own protection, perhaps because of anticipated homosexual assaults or because it is known that another prisoner is out to get him. The cells are typical of those provided for the general population, but movement is restricted. At the time of trial, there were forty inmates in institutional lockup. They have restricted employment opportunities in the book bindery or as a tier runner. Exercise is available only in the cell inasmuch as they cannot be released to the bullpen, maximum security outside exercise yard or the general yard to mingle with other prisoners. Formerly they were fed like maximum security prisoners, but since this action was commenced, they have been fed two meals a day in the dining hall under guard.

The "hole" or punitive segregation is the most restrictive form of confinement. It is used as punishment for violations of prison rules. There are seventeen cells in the tier comprising the hole. The small cell has two doors, an inner steel barred door and an outer solid steel door. The cell has no bunk but is provided with a solid steel plate with a thin mattress. There is no running water. The cell has an oriental toilet, that is, a hole in the floor. An outside guard operates the flusher. No smoking is permitted. Inmates may shower and shave once a week at stated times. No employment is permitted. An inmate has a Bible and the possibility of one law book at a time, but no other reading material and no radio, record player or television set. A prisoner in solitary could write one letter a week but could

receive no personal correspondence except legal mail. They have no visitation privileges. Clothing consists solely of a pair of coveralls. One blanket is supplied. On occasion, an inmate has been thrown in the hole naked after having been teargassed.

Some of these conditions have been somewhat ameliorated since this action was filed. Warden Pogue testified that he had ordered five new design security toilets to replace the oriental toilets as part of a phasing-out program.

## DUE PROCESS IN DISCIPLINE

A pre-trial order was entered in this action on November 20, 1973, which outlines in general the issues to be tried. The first aspect of the action concerns due process in the administration of discipline, Counts I, II and IV of the Complaint. The procedures in effect for the administration of discipline to prisoners at the time plaintiffs Craig and Hayter were confined in the hole did not satisfy the minimal requirements of due process. Since this action was tried, we have had assistance from supervening decisions by the Ninth Circuit Court of Appeals and the United States Supreme Court, particularly *Clutchette v. Procunier*, 497 F.2d 809 (9th Cir., April 25, 1974), Opinion on Rehearing, 1974, 510 F.2d 613; and *Wolff, Warden, v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Also, since the action was commenced, there has been a voluntary modification of disciplinary procedures by defendants. No useful purpose will be served by detailing what has occurred. On October 30, 1972, the Attorney General of Nevada, representing defendants, filed a document entitled "Proposed Disciplinary Procedures." In the pre-trial order (p. 2, lines 16–31), defendants stipulated that due process requires the following specific elements be added to the disciplinary procedures which they have already proposed and that the Court enter an order directing that they be followed:

"(c) Defendants stipulate that due process requires the following specific elements be added to the disciplinary procedures which they have already proposed and that the Court enter an Order directing that they be followed:

"1. That the decision reached in a disciplinary proceeding be based upon substantial evidence adduced solely at the hearing.

"2. That there be a written decision setting forth the facts and the reasons for the decision indicating that the decision is predicated solely upon the record.

"3. That a verbatim record of the proceedings be kept.

"4. That Due Process requires a comprehensive set of rules with a relevant schedule of sanctions, setting forth major and minor breaches, and drafted with sufficient specificity to appraise all parties beforehand of what is a punishable offense.

"5. That the procedural safeguards adhere irrespective of the term of confinement in isolation."

An issue remaining for decision is the right to counsel or counsel substitute. This issue is controlled by *Clutchette* and *Wolff, supra*. The aforesaid agreed-upon procedures must be supplemented by the following in order to conform with the *Clutchette* opinion:

■ 1. If a minor infraction, as defined in the Proposed Disciplinary Procedures, is charged and the prisoner is to suffer a loss of privileges, (1) he must be given notice of intent to remove one or more stated privileges, (2) together with a statement of grounds for removal, (3) at a reasonable time before discipline is imposed, and (4) must be given an opportunity to respond before such discipline is imposed.

■ 2. Whenever a prisoner requests and is denied the privilege of confrontation and cross-examination in a disciplinary proceeding in which a serious sanction can be imposed (excluding a proceeding for an infraction that is also a crime), the prison authorities must enter in the record of the proceed-

ing and make available to the prisoner an explanation for the denial.

■ 3. The prison authorities must make provision for a counsel substitute whenever a prisoner subjected to disciplinary proceedings is unable competently to handle his case without help.

■ 4.. A prisoner must be afforded counsel (and not merely counsel-substitute) when he is required to appear before a prison disciplinary committee for violation of a prison rule which may also be punishable by state authorities.

## DENIAL OF STATUTORY GOOD TIME

The forfeiture of statutory credits against the sentence for good behavior granted under N.R.S. 209.280 and 209.-285 is a serious penalty. Nevada law entrusts the forfeiture and restoration of such credits to the state board of parole commissioners:

"209.290 Forfeiture and restoration of credits.

"1. If any convict shall:

"(a) Commit any assault upon his keeper or any foreman, officer, convict or person, or otherwise endanger life; or

"(b) Be guilty of any flagrant disregard of the rules of the prison; or

"(c) Commit any misdemeanor, gross misdemeanor or felony, he shall forfeit all deductions of time earned by him before the commission of such offense, or shall forfeit such part of such deductions as to the state board of parole commissioners may seem just.

"2. If any convict commits a serious violation of any of the rules and regulations of the prison, he may forfeit all or part of such deductions, in the discretion of the state board of parole commissioners.

"3. A forfeiture, however, shall be made only by the state board of parole commissioners after due proof of the offense and notice to the offender, and no forfeiture shall be imposed when a convict has violated a rule without violence or intent, of which the state board of parole commissioners shall be the sole judges.

"4. The state board of parole commissioners shall have the power to restore credits forfeited for such reasons as to it may seem proper."

In implementation of the foregoing statute, proceedings for forfeiture of good time credits are initiated on complaint of the warden before the board of parole commissioners and a hearing is scheduled. Notice is given to the prisoner.

*Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), teaches that if the objective of the action is release from custody or a shortening of the length of confinement, habeas corpus is the exclusive remedy and state remedies must be exhausted. Last year, in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935, 1974, the Supreme Court explained that a civil rights action for damages may go forward simultaneously with a state action for restoration of the forfeited credits. The federal court in the civil rights action may determine the validity of the procedures followed for forfeiture of credits in the light of the requirements of due process, but the court cannot order the restoration of credits found to have been wrongfully forfeited.

■ With respect to the requirements of due process, the *Wolff* Court said: "For the prison inmate, the deprivation of good time is not the same immediate disaster that the revocation of parole is for the parolee." Hence, a lesser quality of due process is required. N.R.S. 209.-290 requires "due proof of the offense and notice to the offender." This is the skeleton of adequate due process and implies complete. compliance with the requirements of *Wolff*, (1) advance written notice of the claimed violation; (2) a written statement by the parole board of the evidence relied on and reasons for the forfeiture of credits; (3) an oppor-

tunity to the offender to call witnesses and present documentary evidence in his defense; and (4) an opportunity to the inmate charged to seek the aid of a fellow inmate or assistance of an impartial staff member, *if* the inmate charged is illiterate or the issues of such complexity as to require assistance to collect and present evidence for an adequate comprehension of the case. The fourth requirement, above, is dictated by *Wolff* in the special circumstances noted.

At the Nevada State Prison, an application for forfeiture of good time credits is, and in the future will be, almost always preceded by a prison disciplinary proceeding which in the future will be conducted pursuant to the requirements of the first section of this opinion. The report of that proceeding will be presented to the board of parole commissioners by the warden. Such a report has, in the past, been relied upon by the parole board. The offender charged must, nevertheless, be given the rights before the board hereinabove delineated.

The importance of this may be illustrated by the testimony of Chappell Hayes, a former prisoner. He was charged and sentenced to the hole for allegedly participating in an altercation or roisterous disturbance in the Library. At the time, according to him, he was taking an aptitude test from Mr. Solaneski (phonetic). At his disciplinary hearing he asked that Solaneski be called as a witness and was refused. After he left the hole and spent several months in maximum housing, he, at classification sessions, requested a report from Solaneski which was never forthcoming. Suppose the Warden had referred his case to the board of parole commissioners for forfeiture of credits. It is important that the board should recognize the need to call Solaneski as a witness in his behalf and not rely solely on the prison disciplinary record.

■ With respect to the named plaintiffs, Craig and Hayter, there was no lack of minimal due process in the parole board proceedings which resulted in a forfeiture of all statutory good time credits. They requested counsel and the request was denied, but both are articulate and intelligent men and fully understood the proceedings. Appointment of counsel or counsel substitute was not required. Their statutory credits were forfeited after they had pleaded guilty and had been convicted in the state district court for attempted escape.

## DUE PROCESS IN CLASSIFICATION

The Nevada statutes impose upon the Warden the duty of classifying and separating prisoners.

"209.260 Classification and separation of prisoners; clothing regulations.

"1. The warden shall classify and separate the prisoners into three grades, as follows:

"(a) In the first grade shall be included those appearing to be corrigible or less vicious than the others, and likely to observe the laws and discipline of the prison and maintain themselves by honest industry after their discharge.

"(b) In the second grade shall be included those appearing to be incorrigible or more vicious, but so competent to work and so reasonably obedient to prison discipline as not to interfere seriously with the productiveness of their labor, or of the labor of those with whom they may be employed.

"(c) In the third grades shall be included those who are incorrigible or so insubordinate as to interfere seriously with the discipline of the prison or with the productiveness of its labor.

"2. The prison garb or dress of the prisoners as classified in compliance with subsection 1 shall be as follows:

"(a) Prisoners comprising the first grade shall be dressed in an outer dress of one color throughout, the color to be selected by the board.

"(b) Prisoners comprising the second and third grades shall be dressed in clothing of the regulation prison garb." N.R.S. 209.260.

"209.270 Warden to make regulations concerning classification and separation of prisoners.

"1. The warden shall make and adopt rules for the separation and classification of prisoners for their promotion and reduction from one grade to another, and from time to time shall change and amend the same as circumstances may require.

"2. In making such rules and regulations, the warden shall, as far as practicable, consistent with the discipline of the prison, adopt such rules as shall, in his judgment, be most conducive to the reformation of the convicts.

"3. A printed copy of the rules and regulations shall, with the approval of the board, be furnished every officer and guard at the time he is appointed and sworn, and so much thereof as relates to the duties and obligations of the convicts shall be hung up in a conspicuous place in each cell and shop, and such rules shall, so far as practicable, be written or printed in a language known to the convict occupying the cell." N.R.S. 209.270.

The conditions of a prisoner's confinement depend a great deal upon the classification process and classification, in the final analysis, is determined by the warden upon review of recommendations made by a classification committee.

Responsive to N.R.S. 209.270(1), *supra*, the Warden has adopted regulations, "Custodial Classification Procedure," Revised 3/2/72. Classification is defined as "the process whereby inmates are assigned various levels of custodial supervision and are programmed according to individual and institutional needs." The regulations recognize that there is an intermeshing of classification as such and disciplinary action. One section provides:

"401.08 DISCIPLINARY CLASSIFICATION

"The Disciplinary Committee shall have classification powers and may establish any degree of custodial supervision they feel is warranted. It shall be the responsibility of the Classification Clerk to transcribe that portion of the Disciplinary Committee meeting minutes which establishes the new level of custodial supervision, on the proper classification chrono format."

There are many kinds of classifications which it is not useful to detail here. They relate generally both to the places of confinement and to the privileges which a prisoner may enjoy. For example, a prisoner may be classed "Minimum A" and housed either in the Main Prison, General Population or the Medium Security Prison and be eligible for Off-Reservation Work Crew Assignments (Section 401.23). The point is that classification does not relate solely to the place of confinement.

The evidence shows that the warden actively pursues his statutory authority with respect to the classification of prisoners and that the recommendations of a classification committee are by no means rubber-stamped. The evidence shows that a prisoner's classification is reconsidered no less often than every ninety days. The hearings consist of personal interviews with the committee which are called without prior notice to the prisoner and are conducted informally. The prisoner's case is reviewed and his progress under the program then in effect is reviewed. The purpose is to "determine if previously recommended programs have been fulfilled and to establish new goals."

Plaintiffs, on behalf of themselves and other inmates complain of these procedures as lacking in due process. The evidence shows that the warden's classification decisions, for example, a decision to maintain a prisoner in maximum housing, are reached after consideration of all sorts of information, some of it hearsay, some suspicion, some inferences

from presumed knowledge not documented in the prisoner's file. The evidence, nevertheless, shows that the warden consistently makes a valiant and sincere effort to make a decision with respect to a prisoner's classification which is responsive to the mandates of the statute.

█ It is our conclusion that the classification process cannot be truly equated with disciplinary proceedings vis-a-vis the requirements of due process of law. The principal Ninth Circuit touchstone in this area is *Allen v. Nelson*, 354 F.Supp. 505 (N.D.Cal.1973), affirmed 1973, 484 F.2d 960. The Circuit Court adopted the opinion of the District Court. The *Allen* case is authority for the proposition that the conditions of confinement of a prisoner are an appropriate subject of a habeas corpus petition if his placement in the prison system is initiated or continued in violation of constitutional safeguards. The *Allen* case analyzed the problems of that petitioner primarily in terms of the cruel and unusual punishment safeguards of the Eighth Amendment but added, as an alternative ground, that the petitioner had been continued in segregated confinement for eighteen months without notice, hearing or an opportunity to refute the reasons for segregated confinement, all in violation of due process of law.

With respect to the general process of classification, it is difficult to envision a procedure under normal due process requirements. If notice is to be given, notice of what—that a meeting will be held? If a decision is made retaining the inmate in his current status, what findings are to be recorded—that no change of program is warranted? The process is an amorphous one, resulting in a broad exercise of discretion and judgment. It is a rare case, indeed, which will lend itself to judicial review. And, unlike the procedures for administration of discipline, the classification process does not lend itself to the elucidation of specific due process requirements.

Each case in this area is unique and must depend on its own special facts. *Allen v. Nelson, supra,* was such a case. The result was dictated by the facts, and the Court had a great deal of difficulty articulating violations of constitutional rights to correct an apparent injustice. In that case, the initial transfer to segregation from the general population was because the prisoner was suspected of complicity in the murder of a correctional officer. The charge was later dropped for lack of evidence, yet he was continued in segregation and, despite numerous reclassification hearings, was continued there for eighteen months, primarily because he was considered a management problem. The Court apparently reached the conclusion that the continuation of the prisoner in segregated confinement under these circumstances was a cognizable injustice and relied upon the Eighth and Fourteenth Amendments to devise a remedy.

█ When another case of that sort arises and, as we have said, it will be a rare case, *Allen v. Nelson, supra,* may be relied upon as precedent. Plaintiffs Craig and Hayter do not pose such a case. On April 3, 1970, they were ringleaders in an attempted escape in which a group of inmates took over a cell house and held two guards as hostages. The prisoners had two automatic weapons and several bombs. One officer was shot and wounded. After twenty-nine days in punitive segregation, both Craig and Hayter remained in maximum housing for about two and one-half years. In the interim, they pleaded guilty to the attempted escape in District Court and the Parole Board revoked all their good time credits.

In the circumstances we have summarized, it is not for the Court to substitute its judgment for that of the Warden and his advisory staff and committees with respect to when, if ever, it would be safe to release a subject to the general population. Here there was no question about the misconduct, unlike the *Allen* case, where the Court believed

the prison authorities were acting on the basis of unwarranted suspicion.

## INMATE TRANSFER TO OUT-OF-STATE FACILITIES

The Nevada Legislature has adopted the Interstate Corrections Compact (N.R.S. § 215.020) and contracts have been entered into between Nevada and other States pursuant to the compact for the reception and treatment of Nevada prisoners in an institution in the receiving state, for instance, California.

In the past, the interstate transfer of prisoners has been administered in accordance with the discretion of the warden and, on occasion, a prisoner has been bundled up and spirited away to an out-of-state institution without prior notice.

Plaintiffs contend that due process applies to action taken in transferring a Nevada prisoner to an out-of-state institution.

This issue has been mooted. On June 6, 1973, Warden Pogue promulgated regulations (Ex. 3 in evidence) which prescribe a procedure for out-of-state transfers, including notice and an opportunity to be heard, providing all the process due in this situation. See: *Fajeriak v. McGinnis*, 493 F.2d 468 (9th Cir. 1974); *Wheeler v. Procunier*, 508 F.2d 888 (9th Cir. 1974); *Gomes v. Travisono*, 490 F.2d 1209 (1st Cir. 1973).

## ACCESS TO JUDICIAL PROCESS

The concept of a prisoner's constitutional right to access to the courts is founded on the Due Process Clause. Here, again, the Supreme Court has spoken with considerable definitiveness. There are three major aspects to the problem, (1) communication with courts and attorneys; (2) legal assistance; and (3) access to legal reference materials.

A prisoner's right to communicate by mail with court officials and with attorneys cannot be curtailed or restricted, although the state is under no obligation to provide the means of communication, i. e., stamps. All legal mail must leave the prison unopened and uncensored. Any incoming legal mail may be opened in the presence of the prisoner for the detection of contraband, but cannot be read or censored by the prison officials. These principles we find to be established by *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

In *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), a prisoner had been disciplined for giving legal assistance to other prisoners. The Supreme Court said:

"Even in the absence of such alternatives, the State may impose reasonable restrictions and restraints upon the acknowledged propensity of prisoners to abuse both the giving and the seeking of assistance in the preparation of applications for relief: for example, by limitations on the time and location of such activities and the imposition of punishment for the giving or receipt of consideration in connection with such activities. Cf. *Hatfield v. Bailleaux*, 290 F.2d 632 (C.A. 9th Cir. 1961) (sustaining as reasonable regulations on the time and location of prisoner work on their own petitions). But unless and until the State provides some reasonable alternative to assist inmates in the preparation of petitions for post-conviction relief, it may not validly enforce a regulation such as that here in issue, barring inmates from furnishing such assistance to other prisoners."

The Court noted alternatives to assistance from other prisoners which had been used in some States, i. e., regular service from paid public defenders, employment of senior law students to aid prisoners, and voluntary service from members of the state bar. None of these sources of help is available in Nevada on a regular basis. Nevada has no law school. Thus the Nevada State Prison must permit inmates to help one another under appropriate regulations

governing security and non-disruption of normal prison management. This Court is aware of no specific regulations at the Nevada State Prison governing legal assistance to prisoners. We know from experience that knowledgeable writ writers, notably Robert Peoples, James Mears and Robbie Craig, have assisted other inmates. And, judging from the flood of correspondence which this Court receives from prisoners, it cannot be surmised that the policy has been unduly restrictive. We note, however, that many letters commence with a phrase such as "I am a layman at law" and indicate that the writer doesn't know what to do about a problem which he thinks he has. *Johnson v. Avery, supra,* observed:

> "In most federal courts, it is the practice to appoint counsel in post-conviction proceedings only after a petition for post-conviction relief passes initial judicial evaluation and the court has determined that issues are presented calling for an evidentiary hearing. E. g., *Taylor v. Pegelow,* 335 F.2d 147 (C.A. 4th Cir. 1964); *United States ex rel. Marshall v. Wilkins,* 338 F.2d 404 (C.A.2d Cir. 1964). See 28 U.S.C. § 1915(d); R. Sokol, A Handbook of Federal Habeas Corpus 71–73 (1965)."

■ The quotation states the practice in this Court. Under these circumstances, we think the Nevada State Prison should anticipate by its regulations the *Johnson v. Avery* problem and should maintain a roster of inmate writ writers and notify incoming prisoners of their availability to render assistance. We realize, of course, that such assistance must be voluntary and that a prisoner cannot be compelled to give legal aid to another. It is also obvious that the pool of inmates with sufficient education or experience or intelligence to offer effective help may vary a great deal from time to time. But an effort along this line should be made.

■ The third problem is that of legal reference materials. In *Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L. Ed.2d 142 (1971), the Supreme Court affirmed the opinion of a three-judge district court in *Gilmore v. Lynch,* 319 F.Supp. 105 (N.D.Cal.1970). The law is that the state must provide a prisoner with reasonable access to adequate legal reference materials. The state's interest in curtailing expense is not an excuse. Without such access, the prisoner's constitutional right to appeal to the courts for redress of alleged wrongs is rendered meaningless, and only those financially capable of retaining private counsel will enter the courtroom door.

The only printed regulations (unless something has been overlooked in the mass of material before the Court) is the following:

> "There shall be a suitable place in each institution where inmates, with the permission of the designated employee, may have access to such law books as are available to them. No law books shall be taken from such place by any inmate. Misuse of the law books may result in denial of permission." Article 5, Section 2501, Nevada State Prison Rules and Regulations.

There is a prison law library and a method of obtaining copies of additional legal references from the State Law Library in Carson City. The law library is supported from three sources—federal funds, state funds and the inmate welfare fund—although state support appears to have been slight.

There is in evidence an inventory of the law library as of 1973. It is woefully inadequate as well as incomplete, that is, many volumes are missing from the sets that are maintained. The service through the very complete Nevada State Law Library in Carson City is helpful as a supplement, but is not a substitute for basic reference materials immediately at hand. The system has worked, in a way, as evidenced by the fifty and sixty page briefs received by this Court, but they must have been prepared after long delays and abrasive frustrations.

■ Many of the books in the present library are useless as ready reference materials. An adequate reference library may be maintained at a relatively small expense. It should include, at a minimum, the decisions of the United States Supreme Court, the complete Federal Reporter System, the complete Pacific Reporter and Shepards Citators for these publications: also, the Nevada Revised Statutes, Nevada Digest and Modern Federal Practice Digest. In addition, there should be more than one set of a general reference work on criminal law, such as the Criminal Law Reporter.

The foregoing is stated in an advisory way. It is suggested that the Board of Prisons obtain recommendations from a committee comprised, perhaps, of knowledgeable persons from the office of the Attorney General, the State Public Defender and others in order to constitute a useful and adequate reference library.

## REASONABLE AND ADEQUATE MEDICAL CARE ·

The parties have stipulated in the pre-trial order that inmates have a constitutional right to a healthful environment and to be provided with reasonable and adequate medical care. They post the questions: What is a healthful environment? What is reasonable and adequate medical care?

With respect to the seventeen cells comprising "the hole" this subject of discussion will be deferred to the section on Cruel and Unusual Punishment.

■ The balance of the maximum security prison is patently not the most healthful environment conceivable. It is rugged, in a sense, but not more so than many hunters, fishermen and hikers accept voluntarily. There is a shortage of recreational space and recreational facilities. But none of these deprivations adds up to a constitutionally impermissible unhealthy environment. The old buildings and cell blocks would, in the opinion of many, best be abandoned, and this seems to be in the mind of the Nevada Legislature and Governor.

■ The lack of adequate medical care has, in the past, been a deplorable situation, but conditions have improved since this action was commenced. A full-time physician and a full-time dentist are now employed, as well as two registered nurses, a psychiatrist and a part-time pharmacist, to service the inmates of the institutions near Carson City. Genuine complaints from inmates are given reasonably prompt attention. There is a prison pharmacy from which all kinds of drugs are dispensed on prescription. There is a prison hospital ward to which sick inmates are removed when the doctor so directs. In instances of emergency or necessity, prisoners are taken under guard to a local hospital for diagnostic or treatment procedures not available in the prison. These facilities and procedures do not support a conclusion of inadequate and unreasonable medical care and treatment. In *Shields v. Kunkel*, 442 F.2d 409 (9th Cir. 1971), the Court wrote:

"Failure or refusal to provide medical care may violate the Fourteenth Amendment, but mistreatment does so only under exceptional circumstances that approach failure to provide care at all. Simple malpractice does not give rise to an action under section 1983. (*Stiltner v. Rhay* (9th Cir.) 371 F.2d 420, cert. denied (1967) 386 U.S. 997, 87 S.Ct. 1318, 18 L.Ed.2d 346). The record in this case shows only a difference of opinion as to diagnosis and treatment, not a refusal to provide treatment. The defendant's views may be wrong and might give rise to a malpractice claim under state law, but they cannot be said to be so outrageous as to amount to no treatment at all. A difference of opinion between patient and physician, without more, does not state a claim under section 1983. (*Coppinger v. Townsend* (10th Cir. 1968) 398 F. 2d 392.)"

See also: *Stiltner v. Rhay*, 371 F.2d 420 (9th Cir. 1967). The record in this case does not support a general charge

of inadequate medical care and facilities at the Prison. Individual complaints of mistreatment will have to be considered on an individual basis under the standard quoted from *Shields v. Kunkel, supra*. Cf. *Jones v. Lockhart*, 484 F.2d 1192 (8th Cir. 1973); *Corby v. Conboy*, 457 F.2d 251 (2nd Cir. 1972).

## INTRA-PRISON TRANSFERS

One section of the pre-trial order states an issue with respect to transfers of the place of confinement within one institution or from one institution to another of the prison system. What are the due process requirements applicable in this circumstance?

We refer, of course, to such things as the involuntary transfer of a prisoner from the medium security prison to the maximum security prison, or from the yard to the maximum housing cell block in the latter facility. Historically, prison officials have been inclined to treat such decisions as classification decisions, but the court in *Allen v. Nelson, supra*, cogently observed:

> "The difficulty is compounded when prison authorities seek to differentiate the justification for 'punitive' as contrasted with 'administrative' segregation. While prison administrators recognize a distinction, the result is often identical. Courts have realistically avoided falling into this semantic 'trap.'

■ As a consequence of more recent considerations of the problem, it is now clear that any involuntary change in a prisoner's conditions of confinement which amount to a *"substantial, significant deprivation of his liberty"* must be preceded by a due process hearing of the sort hereinabove described for major disciplinary infractions under the heading "Due Process in Discipline." *Wheeler v. Procunier*, 508 F.2d 888 (9th Cir., 1974); *Clutchette v. Procunier*, 510 F.2d 613 (9th Cir., 1974). Transfers such as those we have noted above fall into this class. We recognize, nevertheless, that such a transfer may be deemed advisable for other reasons than a major infraction of disciplinary rules. But, because the result is the same, a prisoner must be given a statement of the reasons and an opportunity to refute them before the transfer is made (except in emergencies).

## FIRST AMENDMENT RIGHTS

The rights of prisoners under the First Amendment of the United States Constitution relate primarily to regulations governing correspondence, visits and reading material.

The 1971 Rules and Regulations of the Nevada State Prison include the following:

"2301—POLICY REGARDING MAIL:

"It is considered essential to eventual resocialization of prison inmates that they maintain contact with their families and desirable friends by use of the mail privilege. Therefore, inmates are encouraged to make use of the mail privilege.

"2303—MAIL PRIVILEGES:

"The sending and receiving of mail is a privilege—NOT A RIGHT! Any violation of the rules regarding the mail privilege by either the inmate or his correspondent may cause suspension of mail privileges.

"USE OF THE MAIL PRIVILEGE:

"The warden shall establish regulations governing inmate correspondence. Such regulations shall not be inconsistant [sic] or in conflict with the following provisions:

"1. All correspondence, packages and personal property, sent or received by an inmate, may be inspected and censored. (No inmate shall be permitted to send or receive a package or communication of any nature until he has signed the required form consenting to the opening of same and examination of the contents.) This shall not preclude corre-

spondence between an Attorney-of-Record and his client.

"2. No C.O.D. mail or C.O.D. articles of any kind will be accepted for an inmate.

"3. The system to provide for the payment of postage shall include adequate safeguards against the misuse of stamps and stamped envelopes. At no time will an inmate be permitted to have in his possession more than the number of stamped envelopes and postal cards prescribed by the institutional regulations.

"4. Any inmate who has less than one dollar in his current account may be supplied with a stamped envelope and/or postage for one letter each calendar week.

"5. Inmates shall be limited to the standing reasonable number of letters each week as determined by the institutional regulations.

"6. No articles or merchandise of any kind may be received by inmates unless specifically approved by the institutional regulations.

"7. Inmates may not send or receive letters that pertain to criminal activities; nor lewd, obscene, defamatory, contraband materials, or any other material inappropriate to their rehabilitation.

"8. Persons shall not be permitted to correspond with more than one inmate unless it is established that the correspondent is an immediate relative of the inmate concerned. Any exception must be approved by the Warden or his delegate.

"9. Inmates may not send registered or certified mail or any communication or article requiring a return receipt without the permission of the Warden or his delegate. Nothing in these rules shall deprive an inmate of correspondence with his or her attorney or with Courts having jurisdiction over matters of legitimate concern to him or her.

"10. Funds from individual donors may be sent to inmates only by money orders or certified checks which indicate the name and relationship to the inmate to whom the money is sent.

"11. Newspapers and periodicals on the approved list of each institution may be subscribed to by inmates through the established channels and must come directly from the publisher.

"12. Except with the permission of the Warden or his delegate inmates shall not correspond with other inmates or ex-inmates of any correctional institution. The Warden or his delegate shall ascertain if correspondents are on probation or parole; if so, they must have permission of their supervisor to correspond.

"2304—APPROVAL OF CORRESPONDENCE LIST:

"Except by permission of the Warden, inmates shall be permitted to correspond only with those persons who are on their mailing or approved correspondence list. Such list shall include only members of the inmates family and friends who might contribute to the inmates welfare. A married couple living in the same household may be considered as one. Applications to correspondents, giving the full name, relationship, residence address and mailing address of the proposed correspondent must be submitted on the prescribed form. Before approving the inmates correspondence list the Warden, or his designated representative, shall:

"1. Notify the person named thereon that the inmate has requested permission to correspond with them and ask them if they so desire to engage in such correspondence.

"2. Furnish all correspondents with a copy of the rules and regulations governing correspondence and a notice that all violations may result in the removal of their names from the approved correspondence list.

"3. Conduct such investigations as are necessary to verify the relationship claimed by the inmate and to establish that valid reason exists for permitting such correspondence.

"4. Permit inmates to write to a former and prospective employers and to others on matters of letitimate [sic] business when approved.

"5. Set age limits below which no person, except members of his immediate family, may correspond with an inmate, and set other regulations that protect the interest of both the inmate and the correspondent.

### "2305—CENSORING:

"The Warden may provide for censoring of inmate correspondence and the inspection of all inmate packages by properly qualified employees.

### "2306—CONFIDENTIAL LETTERS:

"Any inmate may address a sealed letter to: the Governor of Nevada, the Warden of the State Prison, Secretary of State of Nevada, Attorney General of Nevada, any Court having jurisdiction of the inmate's case, the Secretary of the Board of Parole, the Secretary of the Board of Pardons, and the inmate's Attorney-of-Record. Correspondence from said Attorneys shall be treated as privileged material.

### "2307—PARTICIPATION IN PRIZE CONTESTS:

"Inmates will not be permitted to participate in contests sponsored [sic] by radio and T.V. programs or in newspapers and other publications, when prizes are offered.

### "ARTICLE 6. VISITING

### "2601—POLICY REGARDING VISITS:

"Visits by family members, desirable friends, business associates and former or prospective employers, contribute to the morale and treatment of inmates. The Nevada State Prison encourages such wholesome visits and provides the means, compatible with security, for such visits.

### "2602—VISITS AND PRIVILEGES:

"Receiving visits is a privilege—NOT A RIGHT!, and is subject to restriction or forfeiture.

### "2603—VISITS TO INMATES:

"The Warden shall establish visiting regulations, not inconsistent or in conflict with the following:

"1. A suitable place within the institution shall be provided for inmate's visits. Except by permission of the Warden, no inmate shall be visited elsewhere.

"2. Any inmate that does not wish to see a visitor shall be requested to refuse such visit in writing and in any case a notation shall be made in the record of such refusal.

"3. A schedule of hours and days on which visits may be held shall be posted.

"4. No money, writing, or merchandise of any sort may be given or received by inmates or visitors, except in accordance with approved institutional regulations or with permission of the Warden.

"5. Visitors will not be permitted to visit more than one inmate in the institution unless the visitor is a member of the immediate family of the inmates concerned.

### "2604—APPROVAL OF VISITING LIST:

"Only those persons named on the visiting list can be permitted to visit an inmate, except by the permission of the institutional head. Such lists shall include only members of the inmate's family and friends who might contribute to the inmate's welfare. A married couple living in the same household may be considered as one. Applications to receive visits giving the full name, relationship, residence address, and mailing address of the proposed visitor must be submitted on the prescribed form. Before such list is approved the institutional head shall:

"1. Inform the person named thereon that the inmate has requested permission to receive visits from them, ask them if they want to make such visits.

"2. Give copies of the institution regulations concerning visits and notice that any violations may result in cancellation of the visiting privileges.

"3. Indicate the age limits below which no person, other than members of the immediate family, may visit an inmate, and such other regulations as should protect the interest of both the visitor and the inmate.

"4. Conduct such investigations as are needed to verify the relationship claim between the visitor and the inmate, and establish that good reason exists for permitting such visits.

### "2605—NARCOTICS:

"Any person having been involved and/or convicted of any type of narcotics offense, will not be permitted to visit without permission of the Warden.

### "2606—RECEPTION OF NEW VISITORS PENDING APPROVAL:

"Qualified employees shall interview all persons not previously approved who request visits to inmates. As requested visits conform to other requirements of the institution, they may be approved for the one visit pending investigation and approval for subsequent visits.

### "2607—SUPERVISION OF VISITS:

"All visits shall be subject to the following requirements:

"1. An employee of the institution shall be present at all times and shall carefully supervise such visits. Exception: The employee shall not be within hearing of an Attorney and his client.

"2. He shall maintain good order and in the event of an inmate or visitor creating a disturbance or becomming [sic] unduly emotional, or for other good or sufficient reasons, he may stop the visit and remove the participants from the visiting area.

"3. Visitors shall be dressed in such a manner as to be acceptable in a public place.

"4. Persons who obviously have been drinking intoxicating beverages or using illegal drugs will not be permitted on the grounds of the institution.

### "2608—PRECAUTIONARY MEASURES:

"The Warden shall provide that all reasonable precautions be taken to make certain that no visitor carries any weapon or other contraband onto the prison grounds. Whenever the head of the institution or his designee deems it necessary he may request the searching of and/or the finger printing of any person who enters the institutional grounds. Refusal to comply with the above may result in the cancellation of the visiting privileges.

### "2609—VISITS BY FORMER INMATES:

"Visits to the Nevada State Prison or lands adjacent to them by ex-inmates of this or any other State are prohibited unless the visitor has permission from the Warden. If the visitor is on parole or probation, permission will not be given unless such visits have been previously approved by their supervisors."

With respect to reading materials, there is a rule against the possession of "lewd or obscene writing or pictures or any other indecent materials" (Sec. 1206; and under Rule 2303(11), *supra*, newspapers and periodicals must be on an approved list. The publications available in the prison library have presumably been screened.

Here, again, the 1971 rules and regulations do not accurately portray the present prison policies in these areas and it is difficult to determine from the evidence exactly what has transpired.

With respect to correspondence, the Nevada rules are quite similar to those promulgated in California which were held unconstitutional in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (April 29, 1974). In *Martinez*, as a preface to the ultimate holding, the Court had this to say:

"Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope

of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill-equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism."

*Martinez* went on to hold that prison regulations of this type restricting correspondence in instances where an identifiable governmental interest such as "the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners" is not demonstrably affected cannot stand. The decision also approved the requirement that if mail is censored, there must be procedural safeguards.

Subsequent First Amendment decisions in the context of prison administration have served to clarify the *Martinez* guidelines. *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Saxbe v. Washington Post Co.,* 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

The guidelines established by these cases are specific and understandable. The Prison Board may easily approve new regulations which are not unconstitutionally vague and which do not infringe rights under the First Amendment.

We may observe in passing that the evidence adduced at trial showed a propensity of the prison officials to exercise censorship on the basis of their own personal prejudices and predilections. This can happen only because of the vagueness and generality of existing regulations. It is apparently a prevalent practice which was alluded to unflatteringly in the *Martinez* opinion.

■ With respect to visitation privileges, we think it may fairly be said that the *Pell* and *Saxbe* decisions, supra, give the states a broader discretion reasonably to control visits between prisoners and non-prisoners in promotion of the governmental interests in prison security and in prisoner rehabilitation. So long as there are reasonable alternative means of communication, a prisoner has no First Amendment right to associate with whomever he sees fit. *Pell v. Procunier, supra.*

■ There is not much in the Nevada Prison Rules about reading material. As we have noted, possession of lewd, obscene and indecent materials is prohibited, and Rule 2303(7) precludes the sending or reception through the mails of lewd, obscene or defamatory materials or "any other material inappropriate to their rehabilitation." These standards are too vague and broad to be enforceable. They lead to the arbitrary confiscation of reading matter by the prison guards dictated by the personal prejudices and predilections of the confiscator. The evidence shows that this is what has occurred at the instant prison. If reading matter is to be censored or prohibited, here, as in the case of censored correspondence, there should be procedural safeguards such as

those approved in the *Martinez* case, *supra*. One regulation, Section 1802, precludes pictures or decorations which feature nudity. This, our tour of the prison disclosed, is honored more in the breach than in the observance.

## CRUEL AND UNUSUAL PUNISH-MENT

■ The Eighth Amendment to the Constitution of the United States provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." These restrictions on governmental excesses are made applicable to the states through the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

■ Plaintiffs, in addition to attacking specific aspects of Nevada penal treatment, argue, in substance, that the whole penal system is base, ineffective and inhuman and should be voided in response to the dictates of the Eighth Amendment. These sociological arguments are more properly addressed to the Legislature than to the Courts. There is, of course, much to be said to the point that our penal system as a whole is a drastic failure and serves little to accomplish the ultimate goals for which it was created. But these contentions, if accepted as true, do not bring it in conflict with the prohibitions of the Eighth Amendment.

"When a prison regulation[s] [and] practice[s] offends a fundamental constitutional guarantee, the federal courts will discharge their duty to protect constitutional rights." *Procunier v. Martinez, supra*. The difficulty lies in defining the impact or scope of the Eighth Amendment guarantee against cruel and unusual punishment. Much has been written on the subject, but the lessons are not particularly clear and there is little consensus. For instance, in the landmark case of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), which voided state death penalty statutes where the imposition of capital punishment was left to the unguided and uninformed discretion of a jury, the High Court entered a per curiam order which was supplemented by five separate concurring opinions, followed by four separate dissenting opinions. It is clear, nevertheless, that the Eighth Amendment does have meaning and must be given effect in an appropriate case. *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910); *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

The most lucid exposition of the meaning of the Eighth Amendment is found in *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), where Chief Justice Warren wrote for the majority of the Court:

"The exact scope of the constitutional phrase 'cruel and unusual' has not been detailed by this Court. But the basic policy reflected in these words is firmly established in the Anglo-American tradition of criminal justice. The phrase in our Constitution was taken directly from the English Declaration of Rights of 1688, and the principle it represents can be traced back to the Magna Carta. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards. Fines, imprisonment and even execution may be imposed depending upon the enormity of the crime, but any technique outside the bounds of these traditional penalties is constitutionally suspect. This Court has had little occasion to give precise content to the Eighth Amendment, and, in an enlightened democracy such as ours, this is not surprising. But when the Court was confronted with a punishment of 12 years in irons at hard and painful labor imposed for the crime of falsifying public records, it did not hesitate to declare that the penalty was cruel in its

excessiveness and unusual in its character. *Weems v. United States*, 217 U.S. 349 [30 S.Ct. 544, 54 L.Ed. 793]. The Court recognized in that case that the words of the Amendment are not precise, and that their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."

It is difficult to identify objective criteria under which the standards of the Eighth Amendment may be applied with some semblance of uniformity. The writers of the article in the Georgia Law Review, Vol. 8, p. 919, have culled four more or less objective criteria from Supreme Court opinions, (1) the attitude of society in general toward the punishment; (2) its historical usages; (3) its existence in other jurisdictions; and (4) its penological effectiveness.

There are three phases of the administration of the Nevada State Prison which evoke comment in the context of the Eighth Amendment. The first of these is the "hole," where punitive segregation is inflicted. Isolated confinement is not, *per se*, cruel and unusual. *Burns v. Swenson*, 430 F.2d 771 (8th Cir. 1970); *United States ex rel. Knight v. Ragen*, 337 F.2d 425 (7th Cir. 1964); *Sostre v. McGinnis*, 442 F.2d 178 (2nd Cir. 1971); *Novak v. Beto*, 453 F.2d 661 (5th Cir. 1971). Nevertheless, the conditions suffered by a prisoner in the "hole" may be so atrocious as to constitute cruel and unusual punishment. *Jordan v. Fitzharris*, 257 F.Supp. 674 (N.D.Cal.1966). On this issue, we find the discussion in the *Novak* case, *supra*, particularly helpful, and quote:

"We must, therefore, examine the particular conditions that existed in each system previously scrutinized by the courts. *Holt v. Sarver*, E.D.Ark. 1969, 300 F.Supp. 825. On the question of particular conditions, there are several cases that have concluded that certain prison conditions were so 'base, inhuman and barbaric' that they violate the Eighth Amendment. We have

studied these cases and the conditions depicted therein rather carefully, and find in none of them support for condemnation of solitary confinement in this case. In the first place, there is a common thread that runs through all these cases and that is not present in our case. That thread is the deprivation of basic elements of hygiene. See, e. g., *Wright v. McMann*, 2d Cir. 1967, 387 F.2d 519 [complaint alleged cell encrusted with excrement, plaintiff entirely naked, forced to sleep on concrete floor, windows open throughout subfreezing weather, no soap, towel or toilet paper]; *Hancock v. Avery*, M.D.Tenn.1969, 301 F.Supp. 786 [hole for waste, flushed irregularly by guard, no soap, towel or toilet paper, prisoner slept naked on floor]; *Holt v. Sarver*, supra [isolation cells dirty and unsanitary, pervaded with bad odors, plain cotton mattress uncovered and dirty; conducive to spreading, and did spread, infectious diseases]; *Jordan v. Fitzharris*, N.D.Cal.1966, 257 F.Supp. 674 [cells not cleaned regularly, prisoner had no means to clean himself, a hole for receiving bodily wastes, no flushing mechanism]. By contrast with these cases, the prisoners in the TDC solitary confinement cells are deprived of none of the basic elements of hygiene. It is uncontradicted that solitary cells are scrubbed by the guards each time the prisoner leaves to bathe, which occurs at least three times a week. The cells are identical to the regular cells of the TDC in size and facilities; they contain flush toilets, a drinking fountain, and a bunk. The prisoner is supplied with toilet paper, a toothbrush and tooth paste. Although the bunk is stripped in the sense that it has no mattress or pillow, the prisoner is given two blankets and is clothed in a gown or other garb, so that there is nothing to compare with the reports of prisoners sleeping naked on concrete floors in the above-cited cases. In addition, solitary cells in the TDC have the same temperature controls

that regular cells in the prison have. We think it is correct to say, therefore, that no case has found conditions comparable to those in the TDC unconstitutional."

The conditions in the Nevada "hole" have been generally described on page 661, *supra*. They lie somewhat in between the worst and the best, leaning toward the worst. A visit to the prison is necessary to give anyone a proper perspective, and, assuredly, only one suffering the punishment can appreciate the true impact of the deplorable conditions. Long confinement under these circumstances results in serious sensory deprivation and lasting damage to the prisoner. The evidence before this Court is unanimous to this effect, not only the testimony of inmates and former inmates but the testimony of professional witnesses, Dr. David Fogel, former Commissioner of Corrections for the State of Minnesota Prison Systems; Mr. William G. Nagel, Executive Director of the American Foundation; Dr. Frederick William Allport, a Reno psychiatrist; and Dr. Richard Komisaruk, a California psychiatrist. The State's opposition to this testimony was virtually non-existent. Warden Pogue testified from his years of experience in correctional work that use of punitive segregation as a correctional device worked, but he didn't know why. It may work as well under less tormentive conditions of confinement, and apparently does in other institutions. Such offensive treatment tends to brutalize the keeper as well as the kept.

No one disputes that the prison officials require some way to discipline a prisoner who commits a serious infraction of prison rules, but the methods employed must be commensurate with the protections of the Eighth Amendment against cruel and unusual punishment.

 We think a line can be drawn between discipline that, on its face, seems to be nothing less than an effort to torture and degrade the inmate, and conditions that constitute only a deprivation of prison amenities that he would otherwise enjoy. In the former category, we would place (1) oriental toilets; (2) solid steel doors; (3) insufficient clothing; and (4) insufficient facilities for personal hygiene. If proper prison administration continues to require the use of the "hole" at all, toilets and wash basins should be installed in each cell, the solid steel doors should be removed, and, if replaced, barred doors should be substituted, and adequate clothing and bed covering should be supplied. The length of punitive confinement is also important. The longer the confinement, the greater the brutalization and degradation. In the past, twenty-nine days was a common sentence. The testimony shows that more recently, the maximum sentence has been fifteen days. This should be enough. After all, graduation to maximum housing is not very much of an improvement.

 The Eighth Amendment next must be brought to bear on the psychiatric ward. At the Nevada State Prison, the psychiatric ward is the former death row, most of the cells being in full view of the gas chamber. Shocking as this may be, the principal problem with the psychiatric ward is that there are many people incarcerated there who have never been convicted of any criminal offense. This may be hard to believe, but it is true. There are two classes of these non-convicts—persons charged with crime who have been found incompetent to stand trial and people who have been committed to the Nevada State Hospital as mentally ill and have been ordered by the Court to be confined in the prison for security reasons.

The Nevada Revised Statutes provide:

"433.315 Commitment of mentally ill to state prison.

"1. Whenever a person legally adjudged to be mentally ill is deemed by the court or the administrator, upon medical consultation, to be a menace to public safety, and the court is satisfied that division facilities are inadequate to keep such mentally ill person

safely confined, the court may, upon application of the administrator, commit such person to the Nevada state prison. The person shall be confined in the Nevada state prison until the further order of the committing court either transferring him to a division facility or declaring him to be no longer mentally ill.

"2. All provisions of law, so far as the same are applicable, relating to the confinement of mentally ill persons in division facilities shall apply to confinement of mentally ill persons in the Nevada state prison."

"178.400 An insane person cannot be tried, sentenced or punished for a public offense. An act done by a person in a state of insanity cannot be punished as a public offense, nor can a person be tried, adjudged to punishment, or punished for a public offense while he is insane."

"178.425 Procedure on finding of insanity. If the court finds that the defendant insane, the judge shall order the sheriff to convey him forthwith, together with a copy of the complaint, the commitment and the physicians' certificate, if any, into the custody of the administrator of the mental hygiene and mental retardation division of the department of human resources for detention and psychiatric treatment at the Nevada state prison or at a facility operated by the mental hygiene and mental retardation division.

"2. The defendant shall be held in such custody until returned for trial or judgment as provided in NRS 178.-450 to 178.465, inclusive.

"3. Proceedings against the defendant must be suspended until the sanity commission finds him capable of standing trial or opposing pronouncement of judgment as provided in NRS 178.460."

"209.145 Warden to provide facility for detention, treatment of persons committed to custody of mental hygiene and mental retardation division. The warden shall provide a facility for the detention and treatment of such persons committed to the custody of the administrator of the mental hygiene and mental retardation division of the department of human resources pursuant to NRS 178.425 as the administrator may deem it proper to place in such facility."

These statutes are unconstitutional, perhaps not on their face but in the way they are being implemented and administered. There can be no conceivable excuse in the mind of a reasonably civilized man or woman for confining a person who has been convicted of no offense and whose sole "crime" is mental illness in the death row cell block of the maximum security prison. To this point, there is fairly direct authority under the Eighth Amendment. In *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), the High Court struck down a statute which imposed criminal sanctions against a person for being addicted to the use of narcotics, and said:

"This statute, therefore, is not one which punishes a person for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior resulting from their administration. It is not a law which even purports to provide or require medical treatment. Rather, we deal with a statute which makes the 'status' of narcotic addiction a criminal offense, for which the offender may be prosecuted 'at any time before he reforms.' California has said that a person can be continuously guilty of this offense, whether or not he has ever used or possessed any narcotics within the State, and whether or not he has been guilty of any antisocial behavior there.

"It is unlikely that any State at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease. A State might determine that the gen-

eral health and welfare require that the victims of these and other human afflictions be dealt with by compulsory treatment, involving quarantine, confinement, or sequestration. But, in the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. See [*State of Louisiana ex rel.*] *Francis v. Resweber,* 329 U.S. 459 [67 S.Ct. 374, 91 L.Ed. 422].

"We cannot but consider the statute before us as of the same category. In this Court counsel for the state recognized that narcotic addiction is an illness. Indeed, it is apparently an illness which may be contracted innocently or involuntarily. We hold that a state law which imprisons a person thus afflicted as a criminal, even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment. To be sure, imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual. But the question cannot be considered in the abstract. Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold."

While the vice in our case is not that the statute makes a criminal offense of a disease, it is that the statute, as it is administered, does treat a mentally ill person as if he were a vicious convicted criminal. Such conduct by state officials cannot be tolerated under the Eighth Amendment.

Only Richard Komisaruk, M.D., a California psychiatrist with years of experience in the California prison system, testified directly on this issue. The State offered no rebuttal. At the time Dr. Komisaruk visited the prison on March 30, 1974, there were six citizens on "death row" who had been civilly committed and nine who had been charged with a crime but had been found mentally incompetent to stand trial. Dr. Komisaruk testified that a feeling of guilt is an important factor in major mental illnesses which could not conceivably be alleviated under these conditions of confinement. It was, further, his opinion that lockup of any sort should be used very sparingly in treatment of psychiatric patients and that when they are handled as custodial problems, there is little likelihood of improvement. He further stated that in California persons in the classes of those now on Nevada's "death row" had for years been handled in mental institutions under minimum security conditions, with no problems. As stated, there was no rebuttal.

To our mind, the Eighth Amendment has impact in one more area, that of institutional lockup or administrative segregation, described on pp. 661–662 *supra.* Among the some forty inmates so confined, and the confinement is quite constrictive with slight opportunity for education, training or rehabilitation, are several under the age of twenty-one years. The only reason for such tortuous confinement is the safety of the boy himself. He is deprived of the meagre opportunities for exercise, employment, recreation, education and training in the general population of the maximum security facility and the more expanded opportunities in the medium security prison, not because of anything he has done but solely because the evidence indicates that it is not safe for him to be in the general population.

Here, again, this situation seems an affront to any reasonable concept of civilized treatment of prisoners. Whatever may be concluded about the proper treatment of adults, recidivists and confirmed criminals, we cannot give up on our young people, particularly if more reasonable alternatives are available. These young men, whose only need for

strict confinement is their own safety, might be transferred to the Nevada Youth Training Center. N.R.S. 209.250 provides:

"209.250 Transfer of minors from state prison to juvenile correctional institutions. The state board of parole commissioners is authorized, in its discretion and with the consent of the superintendent of the Nevada youth training center or the superintendent of the Nevada girls training center, to transfer to the Nevada youth training center or the Nevada girls training center any minor persons who are now, or hereafter may be, inmates of the Nevada state prison."

In addition, Nevada has enacted the Interstate Compact on Juveniles (N.R.S. 214.010, et seq.) pursuant to which prisoners in this category may be transferred to a correctional institution in another state with which an interstate agreement has been consummated. Juvenile correctional institutions or training centers in Nevada and elsewhere, however difficult their problems may be, must be a better solution than strict confinement in a maximum prison cell. At the very least, an effort can be made to attempt the rehabilitation of the young man in a place where educational and training opportunities are present. If he should prove beyond redemption, he can be returned to prison.

While this is a more borderline case, the Eighth Amendment dictates rejection of continued confinement of a nineteen or twenty year old boy in institutional lockup solely for his own protection. It is cruel and unusual punishment and contrasts strongly with the more favorable treatment and privileges accorded adult recidivists and confirmed criminals who happen to be safe in the general population. In the words of Chief Justice Warren, the situation is incongruous in the light of "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles, supra.*

RETROACTIVITY

The burden, imposed on the courts in considering complaints respecting prison administration is of fairly recent vintage. Procedures followed by prison administrators for a century and a -half have been overturned and improved. There has been a plethora of court rulings, only a handful of which have been cited in this opinion. The question has arisen, of course, whether a court decision is retroactive, that is to say, for example, whether prisoners Craig and Hayter, disciplined without counsel in 1971 for attempted escape which they could be and were prosecuted for in the state court, can now rely upon *Clutchette v. Procunier, supra,* and seek damages. *Wolff v. McDonnell, supra,* had this to say on the subject:

"The question of retroactivity of new procedural rules affecting inquiries into infractions of prison discipline is effectively foreclosed by this Court's ruling in *Morrissey* [*v. Brewer*] that the due process requirements there announced were to be 'applicable to *future* revocations of parole,' 408 U.S. [471] at 490 [92 S.Ct. 2593 at 2604, 33 L.Ed.2d 484] (emphasis supplied). Despute the fact that procedures are related to the integrity of the fact-finding process, in the context of disciplinary proceedings, where less is generally at stake for an individual than at a criminal trial, great weight should be given to the significant impact a retroactivity ruling would have on the administration of all prisons in the country, and the reliance prison officials placed, in good faith, on prior law not requiring such procedures. During 1973, the Federal Government alone conducted 19,000 misconduct hearings, as compared with 1,173 parole revocation hearings, and 2,023 probation revocation hearings. If Morrissey-Scarpelli [*Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656] rules are not retroactive out of consideration for burden on federal and state offi-

cials, this case is *a fortiori*. We also note that a contrary holding would be very troublesome for the parole sys-tem since performance in prison is often a relevant criteria for parole. On the whole, we do not think that error was so pervasive in the system under the old procedures to warrant this cost or result."

██ The same reasoning applies to all aspects of prison administration. All the alleged misconduct testified to in this case occurred prior to the rendition of the significant court rulings which have been cited hereinabove and which have provided new guidelines for prison administration. None of the inmates, including named plaintiffs Craig and Hayter, is entitled to damages.

This is the result dictated by the second revised opinion on rehearing in *Wheeler v. Procunier*, 508 F.2d 888 (9th Cir. 1974):

"This is, then, the third time that this case has come before this Court. This rehearing is granted to assess the impact of the nonretroactivity holding in *Wolff v. McDonnell*, 418 U. S. 539 [94 S.Ct. 2963, 41 L.Ed.2d 935] (1974) both on this Court's deci-sion in *Clutchette v. Procunier*, 497 F.2d 809 (9th Cir. 1974) [decided April 25, 1974], as modified on re-hearing October 21, 1974, and our pre-vious opinions in this case.

"The California Department of Corrections conducts 20,000 discipli-nary actions annually (exclusive of ju-venile or female infractions or trans-fers). For this Court to apply Clutchette retroactively would release a deluge of actions by inmates seeking to resurrect old infractions in the hope of effecting present parole con-siderations. We find the same gov-ernmental interests in efficient prison administration which led the Supreme Court in Wolff to limit that decision's effect only to prospective application, are also present here. We there-fore hold that our decision in Clutch-ette shall only be applied prospective-

ly. Cf. *M'Clary v. California Adult Authority* No. 74–1281 Memorandum (9th Cir. decided 8/6/74; *Goodman v. Kerr*, No. 74–1778 *Memorandum* (9th Cir. decided 9/13/74). The al-leged violation in this case occurring in the fall of 1971, being both pre-Clutchette, and pre-Wolff, we find that the district court did not err in dismissing appellant's action pursuant to Rule 12(b)(6) F.R.C.P."

The Court affirmed dismissal of the action. The second *Wheeler* opinion, *Wheeler v. Procunier*, 508 F.2d 888 (Sep-tember 16, 1974, 9th Cir.), shows that the Wheeler action was not limited to due process in discipline. It also in-volved issues of cruel and unusual pun-ishment, access to the courts and censor-ship of mail.

Accordingly, the orders hereinafter entered shall apply only prospectively.

## MANAGEMENT OF THE PRISON

Article 5, Section 21, of the Nevada Constitution provides:

"The Governor, Secretary of State and Attorney General shall constitute a Board of State Prison Commission-ers, which Board shall have such su-pervision of all matters connected with the State Prison as may be pro-vided by law."

The Nevada Legislature has imple-mented the constitutional provision (N. R.S. 209.010, et seq.). These statutes provide, in part:

"209.010 Definitions. As used in this chapter:

"1. 'Board' means the board of state prison commissioners as defined by section 21 of article 5 of the con-stitution of Nevada.

"2. 'Warden' means the warden of the Nevada state prison."

"209.030 Secretary of board to keep complete account of board pro-ceedings. The secretary shall keep or cause to be kept a full and complete account, in a book or books to be kept for that purpose, of all the transac-tions and proceedings of the board."

"209.040 General powers of the board. The board shall: ·

"1. Have full control of all of the state prison grounds, buildings, prison labor and prison property.

"2. Purchase, or cause to be purchased, all needed commissary supplies, all raw materials and tools necessary for any manufacturing purposes carried on at the state prison.

"3. Sell all manufactured articles and stone and collect the money for the same.

"4. Rent or hire out any or all of the labor of the convicts and collect the money therefor.

"5. Regulate the number of officers and employees."

"209.070. Punishment for violation of board regulations; cruel punishment prohibited.

"1. Any person who shall violate any of the rules, regulations or bylaws of the state prison, as adopted and published by the board, shall be subject to such penalties as may be prescribed by the board, and proceeded against in such manner as may be prescribed by law and the rules of the board.

"2. No barbarous punishments, by whipping, showering or otherwise, shall be prescribed by the board, nor shall convicts, as punishment, be deprived of regular rations of food and at the same time be compelled to work the usual number of hours per day."

These statutes and others make it clear that the Board of Prison Commissioners is primarily responsible for the administration of the prison, and the promulgation of rules and regulations governing the prisoners, employees and other persons. To the Warden, alone, however, is delegated authority to make rules and regulations governing the "separation and classification" of prisoners (N.R.S. 209.270, supra). These functions are somewhat interrelated.

Warden Carl Hocker, the predecessor of Warden Pogue, under date of November 1, 1971, promulgated Revised Rules and Regulations for the Nevada State Prison. Portions have been quoted in the foregoing opinion. Since his appointment in April 1973, Warden Pogue has promulgated amendments and supplements to the basic rules and regulations (for example, the procedures for interstate transfer of prisoners hereinabove referred to).

Secretary of State William Swackhammer was called by plaintiffs as a witness. He is secretary of the board of prison commissioners and was asked to produce the minutes. He said he could find none and that the board met very infrequently. None of the regulations have been promulgated or even approved by the board.

The fact is that for years, the management of the State Prison and the discipline of prisoners has been left almost exclusively to the incumbent warden. It seems obvious from a reading of the statutes that this is not the legislative intent.

Prison officials have a very difficult task. In their constant association with social misfits, faced with insults, threats and danger to the safety of themselves and their employees, they are apt to acquire a somewhat myopic view of the rights and privileges of prisoners as citizens and human beings. The Nevada Constitution and statutes place responsibility for supervision of the prison in a board of prison commissioners. The evident intent is that this lay board, removed from the difficult problems of prison administration, should review and pass upon the basic rules and regulations in the light of their own experiences, knowledge of public affairs, social conscience and legal expertise.

## ATTORNEYS' FEES AND COSTS

Plaintiffs have asked for attorneys' fees and costs. Resolution of this issue will be postponed and if an appropriate motion is made, supported by a factual showing, the issue will be considered.

## CONCLUSION

The problems of prison administration have always been exceptionally difficult. In recent years, there has been a revolution in the law respecting prisoners' rights. Nothing that has been said is intended as a criticism of the administration of the Nevada State Prison, the Warden or other personnel. The Court has ruled in accordance with its understanding of the law as it has been evolving.

A decree shall be entered in conformity with the foregoing opinion.